UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

ROBERT J. WIELAND                                      CIVIL ACTION NO. 05-2088
Individually and obo All Others Similarly Situated
EL PASO FIREMEN & POLICEMEN'S
PENSION FUND
NORMAN V. MEYER
ROBERT E. HOLZRICHTER

VS.                                                                 JUDGE MELANÇON

STONE ENERGY CORP.                                 MAGISTRATE JUDGE METHVIN
DAVID H. WELCH
KENNETH H. BEER
D. PETER CANTY
JAMES H. PRINCE

*REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS*
*(Rec. Doc. 68 and 75)*

Before the court are two motions filed by defendants seeking dismissal of plaintiffs'

claims pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4.  Plaintiffs filed an

opposition and defendants replied.[1]  The motions were referred to the undersigned for report and

recommendation.  For the following reasons, it is **RECOMMENDED** that the motions be

*granted in part and denied in part.*

## I.  Background

The instant consolidated class action is based upon allegations that Stone Energy

Company and four of its top executives schemed to overstate Stone's proved oil and gas reserves

by over 20% over a 4 ½ year period in violation of SEC rules.

---

[1] Rec. Docs. 76 and  80.

2

Plaintiffs are persons and entities who purchased or acquired shares of Stone stock between May 2, 2001 and March 10, 2006 (the "Class Period"). In March, 2006, the court appointed El Paso Firemen and Policemen's Pension Fund as the lead plaintiff.[2]

Plaintiffs allege violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934, Title 15 U.S.C. §78j(b)[3] and 78r(a)[4], and Rule 10b-5, 17 C.F.R. §240.10b-5.[5]

---

[2] Rec. Doc. 16.

[3] **§ 78j. Manipulative and deceptive devices**

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange–

       * * *

*(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange* or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), *any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.* (emphasis supplied)

[4] **§ 78r. Liability for misleading statements**

(a) Persons liable; persons entitled to recover; defense of good faith; suit at law or in equity; costs, etc.

Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 78o of this title, which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading. A person seeking to enforce such liability may sue at law or in equity in any court of competent jurisdiction. In any such suit the court may, in its discretion, require an undertaking for the payment of the costs of such suit, and assess reasonable costs, including reasonable attorneys' fees, against either party litigant.

[5] **17 C.F.R. §240.10b-5 Employment of manipulative and deceptive devices.**

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

3

Defendants contend that plaintiffs' have failed to meet the stringent pleading standard contained in the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4. The PSLRA imposes "special burdens on plaintiffs seeking to bring federal securities fraud class actions" in order to "deter or at least quickly dispose of those suits whose nuisance value outweighs their merits." Merrill Lynch, Pierce, Fenner & Smith v. Dabit, 547 U.S. 71  126 S.Ct. 1503, 1506 (2006) (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 738, 740 (1975).

The purpose and effect of the PSLRA has been described as follows:

> Class actions alleging securities fraud are commonplace. Whenever a publicly traded stock declines in value, an investor is ready to file a class action claiming that the stock price had been inflated or that he would not have invested in the company but for misleading representations made by the company. Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA) hoping, in part, to stem the "abusive" practice of "the routine filing of lawsuits . . . with only a faint hope that the discovery process might lead eventually to some plausible cause of action." H.R. Conf. Rep. No. 104-369, p. 31 (1995), U.S. Code Cong. & Admin. News 1995, pp. 679, 730.

> Class action defendants had high hopes for the PSLRA: it imposes limits on damages and attorney fees, imposes limits on the way lead plaintiffs are selected and the amounts they can be awarded, imposes sanctions for frivolous litigation, provides companies with a "safe harbor" for certain statements, and allows courts to issue stays of discovery pending motions by a defendant to have the case dismiss. See, 15 U.S.C. § 78u-4. Also, Section 21D(b)(2) of the PSLRA requires that a plaintiff alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." SLUSA, discussed in a separate article, represents Congress's attempt to

---

(*Continued from previous page*)
(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

fill in the loopholes in the PSLRA. Other holes, however, have been left to the judicial branch. * * * .[6]

Plaintiffs' amended complaint alleges as follows:

1.    During the Class Period, Stone consistently reported increasing proved reserves of oil and gas.

2.    The reported reserves were overstated as a result of fraudulent conduct by various Stone executives.

3.    Stone's former Chief Executive Officer Peter Canty "was principally responsible for determining and reporting Stone's proved reserves."  During the Class Period, Canty:

    a.    Re-drew geological maps of oil and gas reservoirs to manufacture false reserve numbers;

    b.    Violated SEC requirements for booking proved reserves; and

    c.    Intimidated and verbally abused Stone employees for calculating proved reserves that were lower than Canty wanted.[7]

4.    Other top executives of Stone, Gerald Yunker and Mindy Stuart assisted Canty in pressuring employees into overstating proved reserves.[8]  Yunker and Stuart are not named as defendants.

5.    Defendant James Prince was Stone's Chief Financial Officer and Executive Vice President during part of the Class Period.  Prince "was a controlling person of Stone and exercised his power and influence to cause Stone to engage in the wrongful conduct complained of herein."[9]

6.    Prince and Canty were responsible for filing financial reports for the fiscal years 2001-2004, in which they certified that the reports were accurate and that the reports complied with SEC requirements.

---

[6]  Michael J. Hassen, "Dura Pharmaceuticals v. Broudo -- Class Action Defense Cases", Class Action Defense Blog, July 21, 2007, http://classactiondefense.jmbm.com/20articles/50pslraslusa/

[7]  Amended Complaint, Rec. Doc. 61 at Paragraph 4.

[8]  Id, at Paragraph 6.

[9]  Id, at Paragraph 21(b).

5

7.    Ultimately, Canty was forced to resign as a result of Stone's audit committee of the Board of Directors investigation into its overstatement of proved reserves."[10]

8.    On April 1, 2004, after Canty's resignation, defendant David H. Welch became Stones' CEO. Despite being informed of the overstated proved reserves, Welch continued overstating the reserves for two years.

9.    In August, 2005, defendant Kenneth Beer became Stone's Senior Vice President and CFO.[11] Beer and Welch were responsible for ensuring the accuracy of Stone's financial reports in 2005, which contained the overstatements.

10.   On October 6, 2005, Stone announced a downward revision of the reported proved reserves.[12] As a result, Stone's stock fell.

11.   "Stone ultimately admitted that '[a] material weakness in internal control over financial reporting existed'" and that Stone's "disclosure controls and procedures were not effective in recording, processing, summarizing and reporting information required to be disclosed by us in the reports we file or submit under the Securities Exchange Act of 1934."[13]

12.   On December 5, 2005, Stone announced the findings of the independent review of its proved reserves by the Davis, Polk & Wardwell law firm. The independent review found that Stone lacked adequate internal guidance on the SEC standard for estimating proved reserves and that there was an aggressive "tone from the top" with respect to estimating reserves.[14]

13.   The "proved reserve overstatement was not the product of negligence or mistakes, but rather was caused by senior management's intentional conduct aimed at overstating Stone's proved reserves and inflating its stock price."[15]

_____

[10] Id. at Paragraph 5. Also as a result of the audit committee's investigation, Yunker and Stuart resigned, and Atwater Consultants, Ltd. ("Atwater"), Stone's outside engineering firm which had evaluated and previously audited Stone's reserves, was replaced.

[11] Id. at Paragraph 22.

[12] Id. at Paragraph 10.

[13] Id. at Paragraph 11.

[14] Exhibit "H" to Rec. Doc. 70.

[15] Id. at Paragraph 29.

6

14.    Defendants had actual knowledge (or at least acted with severe and reckless disregard) that the reserves were incorrect and that the financial statements were materially misstated.[16]

No answer has been filed to the complaint.  Instead, defendants filed the instant motions seeking dismissal of plaintiffs' claims.[17]

## II.  Issues Presented

Defendants seek dismissal of plaintiffs' claims on the following grounds:

1.    Plaintiffs fail to allege sufficient facts to establish securities fraud claims; and

2.    Plaintiffs may not maintain claims on behalf of class members who did not incur cognizable losses or who could not have reasonably relied on Stone's statements.[18]

3.    Plaintiffs fail to allege a viable § 20(a) claim because there is no primary violation and because the defendants' cannot be liable for their own statements.

## III.  Law and Analysis

### *Standard for Motions to Dismiss*

"A motion to dismiss 'may be granted only if it appears that no relief could be granted under any set of facts that could be proven consistent with the allegations'." Meadowbriar Home For Children, Inc. v. G.B. Gunn, et al., 81 F.3d 521, 529 (5th Cir. 1996), citing Bulger v. United States Bureau of Prisons, 65 F.3d 48, 49 (5th Cir. 1995).  The allegations in the complaint are construed favorably to the pleader and accepted as true for purposes of the well-pleaded

---

[16] Id. at Paragraph 39.

[17] Defendants filed a supplemental exhibit to the motions to dismiss on May 10, 2007, which consists of Stone's April 26, 2007 8-K filing that incorporates a letter from the SEC Enforcement Division stating that the SEC's investigation into Stone in this matter has been terminated and no enforcement action was recommended.  On May 11, 2007, plaintiffs submitted a letter maintaining that the Form 8-K has no bearing on the currently pending motions to dismiss.

[18] Rec. Doc. 75.

7

complaint rule. Id., 81 F.3d at 529; see also La Porte Constr. Co. v. Bayshore Nat'l. Bank, 805

F.2d 1254, 1255 (5th Cir. 1996). The district court must take the factual allegations of the

complaint as true and resolve any ambiguities or doubts regarding the sufficiency of the claim in

favor of the plaintiff. Jefferson v. Lead Industries Ass'n., Inc., 106 F.3d 1245, 1250 (5th Cir.

1996), citing Fernandez-Montes v. Allied Pilots Ass'n., 987 F.2d 278, 284 (5th Cir. 1993).

The complaint should not be dismissed for failure to state a claim unless it appears

beyond doubt that the plaintiff cannot prove any set of facts in support of his claim that would

entitle him to relief. Id., 106 F.3d at 1250, citing Fernandez-Montes, 987 F.2d at 284, 285;

Leffall v. Dallas Independent School District, 28 F.3d 521, 524 (5th Cir. 1994). However,

conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice

to prevent a motion to dismiss. Id., 106 F.3d at 1250, citing Fernandez-Montes, 987 F.2d at 284,

285; Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994).

### Issue One: Sufficiency of Securities Fraud Allegations

Defendants contend that plaintiffs' claims should be dismissed because the "Complaint is

grounded on the conclusory assertion that, because Stone has investigated, announced, and

corrected errors in its past financial statements, the Company and its former CEO (Peter Canty)

must have engaged in deliberate fraud." Defendants maintain that plaintiffs' allegations "cannot

be reconciled with the PSLRA's mandates."[19]

In order to recover for a violation of §10(b) of the Securities Exchange Act of 1934 and

SEC Rule 10b-5, "a securities fraud plaintiff must prove that the defendant made a (1) mis-

statement or omission (2) of material fact (3) in connection with the purchase or sale of a

---

[19] Rec. Doc. 75.

8

security, which was made (4) with scienter, and upon which (5) the plaintiffs justifiably relied, (6) proximately causing injury to the plaintiffs." Plotkin v. IP Axess Inc., 407 F.3d 690, 696 (5th Cir. 2005) *citing* Rosenzweig v. Azurix Corp., 332 F.3d 854, 865 (5th Cir. 2003).[20]

The PSLRA requires that the elements of a claim be plead with particularity. The PSLRA's particularity requirement incorporates the pleading standard for fraud actions under Rule 9(b) FRCP. Plotkin, 407 F.3d at 696, *citing* Rosenzweig, 332 F.3d at 866. To satisfy Rule 9(b), a plaintiff must specify each allegedly fraudulent statement, the speaker, when and where the statement was made and why the statement was false or misleading.[21]

For the purposes of the instant motions, defendants do not dispute that there were misstatements or omissions of material fact in connection with the purchase or sale of a security. Defendants contend, rather, that plaintiffs have made only conclusory allegations of conscious or

---

[20] Title 15 U.S.C. § 78u-4(b) provides:
(b) Requirements for securities fraud actions
(1) Misleading statements and omissions
In any private action arising under this chapter in which the plaintiff alleges that the defendant-
(A) made an untrue statement of a material fact; or
(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
(2) Required state of mind
In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.
(3) Motion to dismiss; stay of discovery
(A) Dismissal for failure to meet pleading requirements
In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

[21] The Complaint details each statement signed by the individual defendants which contained the misstatements regarding the proved reserves.

9

reckless behavior on the part of defendants which are insufficient to meet the standards of the

PSLRA.

"The PSLRA pleading standard for scienter is especially challenging for plaintiffs."

Plotkin, 407 F.3d at 697.   In order to meet the requirements, the complaint must establish a

strong inference of scienter.  *See* 15 U.S.C. § 78u-4(b)(1); R2 Investments LDC v. Phillips, 401

F.3d 638, 641 (5th Cir. 2005).  The United States Supreme Court recently held that a complaint

will survive a motion to dismiss "only if a reasonable person would deem the inference of

scienter cogent and at least as compelling as any opposing inference one could draw from the

facts alleged."  Tellabs, Inc. V. Makor Issues & RIGhts, Ltd., 127 S.Ct. 2499, 2510, 75 U.S. 4462

(2007).

Scienter encompasses severe recklessness. Plotkin, 407 F.3d at 696, *citing* Broad v.

Rockwell Intern. Corp., 642 F.2d 929, 961-62 (5th Cir.1981).  Severe recklessness is "'limited to

those highly unreasonable omissions or representations that involve not merely simple or even

inexcusable negligence, but an extreme departure from the standards of ordinary care, and that

present a danger of misleading buyers or sellers which is either known to the defendant or so

obvious that the defendant must have been aware of it.'"  Nathenson v. Zonagen, Inc., 267 F.3d

400, 408 (5th Cir. 2001), *quoting* Broad v. Rockwell, 642 F.2d at 961-62.

Plaintiffs must allege that defendants "either consciously misbehaved in issuing the

releases, or [were] so severely reckless that it demonstrates that the defendant[s] must have been

10

aware of the danger of misleading the investing public." Plotkin, 407 F.3d at 696, *citing* Mercury Air Group, Inc. v. Mansour, 237 F.3d 542, 546 n. 3 (5th Cir. 2001).[22]

Plaintiffs are not required to present direct evidence of scienter in order to avoid dismissal of their claims.  A strong inference of scienter can be established by allegations of circumstantial evidence.  *See* Nathenson, 267 F.3d at 424-25.  Further, "[a]ppropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter."  However, allegations of motive and opportunity alone will not fulfill the pleading requirements of the PSLRA.  Nathenson, 267 F.3d at 412.  Likewise, "[t]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information."  Fine v. Am. Solar King Corp., 919 F.2d 290, 297 (5th Cir.1990).

The PSLRA's pleading requirements do not require plaintiffs to name their confidential sources, "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 352 (5th Cir. 2002).

Plaintiffs have provided general descriptions of the employment duties of each of the confidential witnesses ("CWs"), the field in which they worked, and the dates that they were employed by Stone.  The CWs were reservoir engineers and a production manager who allegedly

---

[22] An unattributed corporate statement can be charged to an individual corporate officer only if "specific factual allegations link the individual to the statement at issue," such as "a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement."  Southland Sec. Corp. v. Inspire Ins. Solutions Inc., 365 F.3d 353, 365 (5th Cir. 2004).

11

have knowledge regarding the way proved reserves were calculated at Stone and how and why the reserve reports deviated from SEC requirements.  This background information is sufficient to support the conclusion that a person in the position of the confidential witnesses would possess the information that they allege.

The Complaint alleges the following facts regarding how defendants inflated the reported reserves:

1.  ***Falsifying reserve reports***: According to CW1, Canty created reserve reports that included false information regarding Stone's reservoirs and wells.  These reports were used by Stone to generate its production forecasts.[23]

2.  ***Redrawing Geological Maps***: According to CW1, Canty regularly redrew Stone's geological maps to be bigger than they were in order to inflate Stones' proved reserves.  When Stone geologists presented maps that conflicted with Canty's he told them their maps were wrong and instructed them to enlarge their maps of reservoirs in order to increase reserves.[24]

3.  ***Rejecting Reserve Numbers From Engineers and Creating Reserves***: According to the CWs very few people had access to Stone's reserves information and the tools used to measure the proved reserves.  According to CW3, Canty would meet with Yunker and Stuart to determine whether or not they would accept the reserve numbers calculated by the engineers, and if they did not want to accept these numbers, "Lettie Barnes would then 'slice and dice' the reserve numbers."  Stone management frequently disagreed with the reservoir engineers regarding the proved reserves.  According to CW1 and CW4, Canty even went so far as to create reserve numbers for fields.[25]

4.  ***Verbally Abusing and Intimidating Stone Personnel***: According to CW2, Canty and other Stone management officials, verbally abused and intimidated Stone employees, including geologists and geophysicists, to inflate Stone's reserve numbers.

---

[23] Rec. Doc. 61 at Paragraph 30.

[24] Id. at Paragraph 31.

[25] Id. at Paragraph 34.

12

5. ***Refusing to Write Down Reserves When the Well "Watered Out":*** According to
CW1, Stone personnel discovered in 2003 or 2004 that a well had produced
reserves that were attributed to an adjacent well. Although Canty knew the well
had watered out, he refused to reduce the reserves accordingly. "Stone later
admitted in its October 6, 2005 press release, that the proved reserves for the
South Pelto 23 field had been overstated by 20 billion cubic feet equivalent."[26]

6. ***Production Not Meeting Reserves***: There was a continuous trend of production
that was significantly less than the amount that had been reported as proved
reserves because of the inflated numbers. According to CW1 and CW2,
management blamed the problem on personnel and refused to write off reserves.[27]

7. ***Result of Misstatements on Stock Prices:*** "[I]t was common knowledge within
the Company that Stone was overstating its proved reserves. The reserve
overstatement caused Stones' reported net income and earnings per share to be
overstated, and its reported depreciation, depletion and amortization ("DD&A")
expense to be understated, for each quarter during the Class Period.

8. ***Individual Profit Motive:*** The price for Stone common stock was artificially
inflated during the Class Period, and insiders reaped proceeds of $50 million by
selling over one million shares of their personal holdings of Stone stock. The
insiders' sales, including Canty, Prince, and Yunker, were suspicious in timing
and amount..."[28]

9. ***Corporate Profit Motive:*** Stone, contrary to industry standards, established a
bonus system that was based on the growing reserves. Further, based on Stone's
overstated proved reserves, it was able to increase its asset base, credit facility,
and borrowing power. This in turn allowed Stone to acquire properties and
working interests in fields. The overstated proved reserves allowed defendants to
"artificially inflate the price of Stone common stock, which was used as currency
to acquire additional oil and gas properties."[29] Once Stone disclosed that the
proved reserves had been overstated for four years, its banks reduced its credit line
by "$200 million."[30]

---

[26] Id. at Paragraph 36.

[27] Id at Paragraph 37.

[28] Id. at Paragraph 46.

[29] Id. at Paragraph 51(c).

[30] Id. at Paragraph 51 (b).

13

10.    ***Scienter:***  The individual defendants knew, or were severely reckless in disregarding the fact that Stone's internal controls were inadequate.  Despite this knowledge, defendants executed Stone's financial reports that were filed with the SEC certifying that the internal controls and procedures were effective to assure that the required information was correctly disclosed.  Stone later admitted that it lacked adequate internal controls to ensure that its reports were fairly presented and that the information therein did not contain any untrue statements of material fact.

11.    ***Individual Defendants:***  The overstatements and misstatements of Stone's financial results were reported to the SEC by Canty, Prince, Welch, and Beer during their respective tenures at Stone.  The Complaint sets forth the specific financial statements issued by defendants, and why the market relies on Stone's proved reserve estimations.  Contrary to defendants' assertions in the SEC reports, the estimates of proved reserves were not prepared in accordance with SEC rules.[31]

**1.  §10(b) claims against Stone, Canty, and Welch**

The Complaint alleges the existence of both direct and circumstantial evidence supporting plaintiffs' allegations of fraudulent conduct on the part of Canty and Welch.  The CWs provide detailed information regarding conversations between Canty and Welch and others wherein the problems regarding the overstatements were discussed.

Moreover, plaintiffs have provided specific factual information from CW's which suggest that Canty actively engaged in misrepresentation of the proved reserves.  Likewise, plaintiffs provided particular information regarding Welch's knowledge of the overstated proved reserves and his failure to correct the problem and to provide accurate reports concerning Stone's estimated proved reserves.[32]

---

[31] Further, the Complaint sets forth that during the Class Period, defendants certified their quarterly reports pursuant to § 302 of the Sarbanes-Oxley Act.

[32] Id. at Paragraph 44.

14

Additionally, plaintiffs have sufficiently pled facts regarding Canty and Welch's involvement in preparing the proved reserves reports, e.g. that they held numerous meetings regarding the numbers, were responsible for insuring the accuracy of the numbers, and that they caused the misstatements to be issued.  Plaintiffs' allegations at the very least state a claim for severe recklessness on the part of Canty and Welch  in the issuing of the misstatements. Plaintiffs have also sufficiently alleged that the Sarbanes-Oxley certifications that Canty and Welch signed in connection with Stone's quarterly reports contained false and misleading information.

Furthermore, although motive and opportunity alone do not establish a strong inference of scienter, they do enhance plaintiffs' other allegations of scienter.  Plaintiffs have specifically alleged that Canty benefitted financially from fraudulent conduct in terms of later stock sales**.** Likewise, the complaint alleges that Canty and Welch benefitted financially from the bonus system that Stone established in which bonuses were based on the growing reserves.  *See* Barrie v. Intervoice-Brite, Inc., 397 F.3d 249, 261 (5th Cir. 2005) (defendant's bonuses that are directly related to the wrongdoing can show motive).  Although defendants dispute that Canty and Welch's financial benefits were suspicious, for the purposes of the instant motion and considering the totality of the circumstances, the undersigned concludes that plaintiffs have sufficiently pled that Canty and Welch had financial incentives connected to the alleged fraud.

Because plaintiffs have alleged the requisite scienter as to Canty and Welch, who acted on Stone's behalf, and in the course of their employment, Stone's respondeat superior liability is also adequately alleged.  Southland Securities Corp. v. INSpire Ins. Solutions, Inc., 365 F.3d 353, 380

15

(5th Cir. 2004), *citing* <u>Paul F. Newton & Co. v. Texas Commerce Bank</u>, 630 F.2d 1111, 1118 (5th Cir.1980).

Considering the foregoing, the undersigned finds that plaintiffs have sufficiently pled facts supporting their securities fraud claim against defendants Canty, Welch, and Stone for the purposes of surviving the instant motions to dismiss.

**2.   §10(b) claims against Prince and Beer**

With regard to Prince and Beer, the undersigned concludes that plaintiffs have not sufficiently pled that these defendants either consciously misbehaved or acted with severe recklessness.  There are no allegations that Prince or Beer were aware of the overstated reserves, or that Prince or Beer should have been so aware.  Although both signed documents that indicated that they were responsible for ensuring that the internal controls allowed for accurate reporting, there is no allegation that they were aware that Canty had subverted those controls by redrawing maps and otherwise improperly influencing Stone's engineers.

The only indication of wrongdoing by Prince was that he had motive to commit fraud. Although Prince may have benefitted to some degree by his selling stock prior to Stone's stock falling, this potential motive alone is insufficient to show a strong inference of scienter.  Absent other evidence of Prince's fraudulent conduct, his financial gain is insufficient to meet the pleading requirements of the PSLRA.

The allegations Beer are even further removed.  According to the Complaint, Beer's involvement did not begin until August, 2005, when he became Stone's Senior Vice President and CFO, and was limited to his signature on Stone's reports ending on June 30, 2005.[33]  There are no

_____

[33] Rec. Doc. 61 at Paragraph 22.

allegations that Beer knew of the problems with the overstated reserves or that he benefitted in any way by these overstatements.  Additionally, shortly after Beer became CFO, Stone began investigating the problem and ultimately began issuing public statements concerning the overstated reserves.

Considering the lack of specific allegations of wrongdoing on the part of Prince and Beer, the undersigned concludes that the Complaint fails to state a claim by showing that Prince and Beer acted consciously, or were so severely reckless as to demonstrate that they must have been aware of the danger of misleading the investing public.  Plotkin, 407 F.3d at 696.

Accordingly, it is recommended that defendants' motions to dismiss be **GRANTED** in part, dismissing plaintiffs' §10(b) and SEC Rule 10b-5 claims against Prince and Beer.

*Issue Two:  Class Members*

The Complaint sets forth claims on behalf of persons and entities who purchased or acquired the common stock of Stone between May 2, 2001 and March 10, 2006.  Defendants argue that plaintiffs may not maintain claims on behalf of shareholders who: 1) acquired their shares after Stone placed the market on notice of the errors; or 2) sold their shares before Stone disclosed the reserve errors on October 6, 2005.

**1.  Class members who purchased stock after the first disclosure**

Stone's relevant disclosures as to possible inaccuracies in its reported proved reserves extended over a period of several months, between October 6, 2005 and March 10, 2006.  Defendants do not contest that stockholders who purchased stock prior to October 6, 2005, have sufficiently alleged reliance on alleged misrepresentations.  However, defendants argue that

17

shareholders who purchased stock between October 6, 2005 and March 10, 2006 do not state a

claim because those plaintiffs did not reasonably rely on the alleged misrepresentations.

Stone first admitted the possibility of errors in its prior proved reserve estimates in a press

release dated October 6, 2005, which stated:

*Estimated Proved Reserves*

During the third quarter, Stone conducted an internal reserve review for all of its fields, including using a third party outside engineering firm to review and re-map several of its largest Gulf of Mexico fields. Based on this review, Stone estimates that its proved reserves at September 30, 2005 were approximately 670 billion cubic feet equivalent (Bcfe). A full reserves report by third party engineering firms will be performed at year end.[34]

The Complaint alleges that as a result of the October 6, 2005 news, "Stone's stock

dropped from closing price of $56.07 on October 5, 2005, to $48.14 on October 6, 2005, to

$47.93 on October 7, 2005."[35]

On November 8, 2005, Stone issued a press release, noting that Stone had been reviewing

whether further revisions should be applied due to the previous downward revision of the proved

reserves.[36] The press release stated:

Accordingly, the 2004 financial statements and the independent registered public accounting firm's report related to the fiscal 2004 period contained in Stone's prior filings with the Securities and Exchange Commission ("SEC") should no longer be relied upon. Stone will amend its Form 10-K for the year ended December 31, 2004 and its quarterly reports on Form 10-Q for the periods ended March 31, 2005 and June 30, 2005. Stone hopes to file the amended reports and the Form 10-Q for

---

[34] Exhibit "F" to Rec. Doc. 70.

[35] Rec. Doc. 61 at Paragraph 123.

[36] Exhibit "G" to Rec. Doc. 70.

the period ended September 30, 2005 by November 14, 2005, but no assurances can be given that the filings will be made by that date.[37]

On December 5, 2005, Stone announced the findings of the independent review of its proved reserves by the Davis, Polk & Wardwell law firm, which included findings that Stone lacked adequate internal guidance or training on the SEC standard for estimating proved reserves, that former members of management failed to fully grasp the conservation of the SEC's standard of booking reserves, and that there was an optimistic and aggressive "tone from the top" with respect to estimating reserves.[38]  Davis Polk made several recommendations, including that Stone adopt and distribute written guidelines on the SEC reserve reporting requirements and provide training for the employees.  Stone's December 5, 2005 announcement also stated:

> The Stone audit committee and board of directors have accepted the Davis Polk final report, and the Stone board of directors has resolved to implement all of the recommendations promptly.  In addition to implementing the Davis Polk recommendations, Stone will engage outside consulting firms to independently evaluate 100% of Stone's reserves.  Stone expects that effort to be completed in 2006...

> As previously announced, since the October 6, 2005 announcement of a downward reserve revision, Stone has been reviewing whether portions of the revision should be applied to prior years, which might result in a restatement of prior years' financial statements and related supplemental oil and gas reserve disclosures. Based on Stone's internal review, a restatement of the financial statements will be required for the periods from 2001 to 2004 and for the first six months of 2005. Accordingly, the 2004 financial statements and the independent registered public accounting firm's report related to the fiscal 2004 period contained in Stone's prior filings with the Securities and Exchange Commission should no longer be relied upon...  Stone has received notice that the staff of the SEC is conducting an informal inquiry into the revision of Stone's proved reserves and the financial statement restatement.  Stone is continuing to cooperate with the SEC.  In addition, Stone has received an inquiry from the Philadelphia Stock Exchange with respect

---

[37] Id.

[38] Exhibit "H" to Rec. Doc. 70.

19

to matters including trading activity prior to Stone's October 6, 2005 announcement. Stone intends to cooperate with the Philadelphia Stock Exchange inquiry. Finally, Stone has been advised that class action lawsuits have been or will be filed in connection with the reserve revisions. Stone is evaluating the complaints and intends to vigorously defend any lawsuits that are filed.[39]

On March 9, 2006, Stone announced its year-end 2005 results and that it had completed the restatement of previously filed financial results for 2001 through the second quarter 2005.[40] In Stone's March, 2006 SEC filings, Stone explained that the October 6, 2005 downward revision of 171 Bcfe was increased to 237 Bcfe, and that the "overstatement of proved reserves had the effect of understating the write-down of oil and gas properties."[41] The Complaint sets forth that in response to the news, Stone's dropped from $39.49 on March 9, 2006 to 39.08 on March 13, 2006.[42]

Plaintiffs maintain that defendants' misrepresentations were a fraud-on-the-market, which continued up to Stone's March 10, 2006 statement wherein the inaccuracies contained in the previous proved reserve estimates were disclosed. Plaintiffs argue, therefore, that the court can presume that all stock purchases up to March 10, 2006 were made in reliance on the prior misrepresentations.

In Basic Inc. v. Levinson, 485 U.S. 224, 108 S.Ct. 978 (1988), the Court accepted the economic hypothesis that "the market is transposed between seller and buyer, and ideally transmits information to the investor in the processed form of the market price ... The market is

---

[39] Id.

[40] Rec. Doc. 61 at Paragraph 136.

[41] Exhibit "L" to Rec. Doc. 70.

[42] Rec. Doc. 61 at Paragraph 139.

20

acting as the unpaid agent of the investor, informing him that given all the information available

to it, the value of the stock is worth the market price." Id. at 246.  Thus, the Court concluded that

courts could use the fraud on the market theory to presume reliance on misleading statements even

if the purchasers do not rely directly on the misstatements. Id.  As a result, the Court held that

"where materially misleading statements have been disseminated into an impersonal,

well-developed market for securities, the reliance of individual plaintiffs on the integrity of the

market price may be presumed." Id. at 247.

 A defendant may rebut the presumption by "any showing that severs the link between the

alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to

trade at a fair market price. " Basic, 485 U.S. at 248.  "As a corollary to the fraud-on-the-market

doctrine and a defense to rebut that doctrine's presumption that the defendant's misrepresentations

affected the price of the company's stock, the truth-on-the-market doctrine views a

misrepresentation as immaterial if the information is already known to the market because that

misrepresentation therefore cannot defraud the market."  In re Enron Corp. Securities, Derivative

& ERISA Litigation, 235 F.Supp.2d 549, 574 (S.D.Tex. 2002), citing In re Sec. Litig. BMC

Software, Inc., 183 F.Supp.2d 860, 905-06 n. 46 (S.D.Tex. 2001).  The  truth-on-the-market

doctrine can be used as a defense provided that "the corrective information [was] conveyed to the

public 'with a degree of intensity and credibility' sufficient to counterbalance effectively any

misleading information created by" the allegedly false and misleading statements.  In re Sec. Litig.

BMC Software, Inc., 183 F.Supp.2d at n.46, citing Ganino v. Citizens Utilities Co., 228 F.3d 154,

167 (2d Cir. 2000), quoting In re Apple Computer Securities Litigation, 886 F.2d 1109, 1116 (9th

Cir. 1989).  The truth-on-the-market defense is "intensely fact-specific."  Ganino, 228 F.3d at 167.

21

The undersigned concludes that although the October 6, 2005 press release provided the market with some information concerning Stone's reserve problems, the extent and effect of those problems may not have been fully known until later. Despite Stone's various announcements concerning its internal audit, it was not until the March, 2006 announcement did Stone acknowledge that the initial October, 2005 downward revisions were being subjected to an additional downward revision and the effect of those revisions on Stone's financial position. Thus, although as of October 6, 2005 the market knew of the general problems regarding Stone's proved reserve estimates, there are factual issues concerning whether the full extent and effect of those problems was known at that time.

Moreover, whether Stone's corrective information was conveyed "with a degree of intensity and credibility" is a fact-specific inquiry, which is not appropriately disposed of on a motion to dismiss.

Considering the foregoing, it is recommended that the motions to dismiss the claims of class members who purchased stock after Stone's October, 2005 disclosure be denied.

**2.     Class members who sold stock prior to Stone's disclosures**

Defendants maintain that plaintiffs have failed to establish loss causation on behalf of those shareholders who sold their stock prior to Stone's October 6, 2005 disclosure concerning the problems with the reserve estimates.

The PSLRA requires that plaintiffs prove "loss causation" in a securities fraud action. 15 U.S.C. § 78u-4(b)(4). Plaintiffs "have the burden of proving that the act or omission of the defendant alleged to violate this title caused the loss for which the plaintiff seeks to recover

22

damages." Id.  Loss causation need not be pled with particularity at this stage, since this issue

turns primarily on questions of fact.  Roth v. Aon Corp., 238 F.R.D. 603, 607-608 (N.D.Ill. 2006)

The Supreme Court recently addressed the loss causation requirements of the PSLRA in

Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).  In

Dura, individuals who had bought stock from Dura between April 15, 1997 and February 24, 1998

brought a securities fraud class action against the company and its managers and directors.  The

class members argued that their economic losses were based on the fact that they paid artificially

inflated prices for Dura stock.  The district court dismissed the case, concluding that the complaint

failed to adequately allege loss causation.  The Ninth Circuit reversed, finding that the loss

causation requirement can be met simply by alleging that a stock's price at the time of purchase

was inflated because of the misrepresentation.  The Supreme Court reversed, noting the common

law roots of securities fraud actions and holding that plaintiffs must adequately allege that they

suffered economic losses caused by the defendants' misrepresentations.  The Court rejected the

argument that purchasing stock at inflated prices is sufficient.  The Court stated:

> For one thing, as a matter of pure logic, at the moment the transaction takes place,
> the plaintiff has suffered no loss; the inflated purchase payment is offset by
> ownership of a share that at that instant possesses equivalent value. Moreover, the
> logical link between the inflated share purchase price and any later economic loss
> is not invariably strong. Shares are normally purchased with an eye toward a later
> sale. But if, say, the purchaser sells the shares quickly before the relevant truth
> begins to leak out, the misrepresentation will not have led to any loss. If the
> purchaser sells later after the truth makes its way into the marketplace, an initially
> inflated purchase price might mean a later loss. But that is far from inevitably so.
> When the purchaser subsequently resells such shares, even at a lower price, that
> lower price may reflect, not the earlier misrepresentation, but changed economic
> circumstances, changed investor expectations, new industry-specific or
> firm-specific facts, conditions, or other events, which taken separately or together
> account for some or all of that lower price. (The same is true in respect to a claim
> that a share's higher price is lower than it would otherwise have been-a claim we
> do not consider here.) Other things being equal, the longer the time between

23

purchase and sale, the more likely that this is so, i.e., the more likely that other factors caused the loss.

Id. at 342-343.

The Court concluded that class members' claims should be dismissed because they did not "claim that Dura's share price fell significantly after the truth became known," nor did the complaint otherwise put defendants on notice of what the causal connection might be between the misrepresentations and the economic loss. Thus, the Court espoused the principle that in order to establish loss causation, the plaintiffs must show not only a loss, but that the loss was caused by the defendants' conduct.

The Fifth Circuit discussed the Dura opinion in dicta in a recent criminal case. With respect to loss causation, the court wrote:

> The civil damage measure should be the backdrop for criminal responsibility both because it furnishes the standard of compensable injury for securities fraud victims and because it is attuned to stock market complexities. In civil cases, the principle of loss causation is well established. See Dura Pharmaceuticals, Inc. v. Broudo, --- U.S. ----, 125 S.Ct. 1627, 1631-32, 161 L.Ed.2d 577 (2005); see generally Greenberg v. Crossroads Systems, Inc., 364 F.3d 657 (5th Cir.2004); Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b). ***Thus, there is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines.*** Where the value of a security declines for other reasons, however, such decline, or component of the decline, is not a "loss" attributable to the misrepresentation. See also United States v. Grabske, 260 F.Supp.2d 866, 869-71 (N.D.Cal.2002)

U.S. v. Olis, 429 F.3d 540, 546 (5th Cir. 2005) (emphasis supplied).

In the case at bar, plaintiffs' allegations are insufficient to establish a causal connection between Stone's allegedly fraudulent conduct and any economic losses suffered by individuals or entities who sold their stock prior to Stone's October 6, 2005 disclosure.

24

Plaintiffs rely on In re Bearingpoint, Inc. Securities Litigation, 232 F.R.D. 534 (E.D.Va. 2006). In that case, the court concluded that in-and-out traders (investors who purchased and sold stock prior to the truth being revealed) can qualify as class members because it is possible that those individuals may be able to prove an economic loss if they sold their stock at a price which was less than their purchase price. The court pointed out that, as here, where there are multiple disclosures over a period of time, it is possible that stockholders who sold *during* the disclosure period can prove economic loss. This same issue was cogently discussed in Roth v. Aon Corp., 238 F.R.D. 603, 607-608 (N.D.Ill. 2006), citing In re Bearingpoint.

The instant case is distinguishable from In re Bearingpoint and Roth because plaintiffs have alleged claims on behalf of stockholders who sold stock *prior* to the first disclosure by Stone not during the disclosure period.

Plaintiffs' damages allegations are that they "purchased Stone common stock at artificially inflated prices and were damaged thereby."[43] Taking the allegations of the Complaint in totality, plaintiffs allege that they purchased stock at artificially inflated prices and were damaged when the truth about Stone's proved reserves analysis was revealed and the stock dropped. In the case of stockholders who sold stock prior to any indication of the truth, i.e., the first disclosure on October 6, 2005, it is inconceivable how these class members incurred any recognizable losses or how defendants' actions caused any possible losses.[44] Indeed the Fifth Circuit has acknowledged

---

[43] Rec. Doc. 61 at Paragraph 153.

[44] Moreover, even if the Complaint had alleged that these class members had suffered a loss by purchasing their stock at an inflated price and selling it for a lower price before the truth had been revealed, there is no connection between the alleged misrepresentation and the fluctuations in stock price prior to Stone's disclosures. As noted by the Dura court, the inflated purchase price "will sometimes play a role in bringing about a future loss," however, that merely suggests that the misrepresentation "'touches upon' a later economic loss. But even if that is so, it is insufficient. To 'touch upon' a loss is not to cause a loss, and it is the latter that the law requires." Dura, 544

25

this by stating, "[T]here is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines." U.S. v. Olis, 429 F.3d at 546.

Accordingly, the undersigned concludes that with regard to the class members who sold stock prior to Stone's October 6, 2005 disclosure, the Complaint suffers essentially the same defective pleadings as presented in Dura, i.e., plaintiffs have failed to show a causal link between defendants' conduct and losses suffered prior to the disclosure. It is therefore recommended that the claims of plaintiffs who sold their shares before Stone disclosed the reserve errors on October 6, 2005 be dismissed.

**Issue Three:  Section 20(a) liability**

Plaintiffs allege that Canty, Welch, Beer and Prince are liable as "control persons" over the activity of Stone. Such "secondary liability" is authorized under § 20(a) of the Securities Exchange Act.

Defendants argue that plaintiffs have not alleged a viable § 20(a) claim because there is no primary violation and because the individual defendants cannot be liable for their own statements.

Section 20(a) states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any

---

U.S. at 343 (citations omitted); *see also* In re WorldCom, Inc. Securities Litigation, 2005 WL 375314, *6 (S.D.N.Y. 2005) ("A concealed fact cannot cause a decrease in the value of a stock before the concealment is made public."); Greenberg v. Crossroads Systems, Inc, 356 F.3d 657 (5th Cir. 2004), citing Nathenson v. Zonagen, Inc., 267 F.3d 400, 419 (5th Cir. 2001) ("A causal relationship between the statement and actual movement of the stock price is still required. Indeed, the example itself notes that when the 'truth' is revealed 'the share price will fall.'"). Thus, simply showing that stock was purchased at a price that was inflated due to the misrepresentations and sold at a lower price prior to the disclosure does not meet the loss causation requirement.

26

> person to whom such controlled person is liable, unless the controlling person
> acted in good faith and did not directly or indirectly induce the act or acts
> constituting the violation or cause of action.

15 U.S.C. § 78t(a).

In order for secondary liability under §20(a) to be established, there must be a primary violation.  *See* ABC Arbitrage, 291 F.3d at 348.  "Control person liability is secondary only and cannot exist in the absence of a primary violation."  *See* Southland, 365 F.3d at 383.  Control person liability is not subject to the heightened pleading requirements of Rule 9(b).  Kaltman v. Key Energy Services, Inc., 447 F.Supp.2d 648, 665 (W.D.Tex. 2006).  Therefore, the Complaint need only give the defendant fair notice of the plaintiff's claim and the basis of the allegation.  Abbott v. Equity Group, Inc., 2 F.3d 613, 620 (5th Cir.1993).

In pleading "control," plaintiffs must plead facts indicating that the defendant "had the requisite power to directly or indirectly control or influence corporate policy." G.A. Thompson & Co. v. Partridge, 636 F.2d 945, 958 (5th Cir.1981); McNamara v. Bre-X Minerals, Ltd., 46 F.Supp.2d 628, 637 (E.D.Tex.1999).  Plaintiffs need not allege that the controlling person actually participated in the underlying primary violation to state claim for control person liability.  *See* G.A. Thompson & Co. Inc. v. Partridge, 636 F.2d 945, 958 (5th Cir.1981) ( for a prima facie case it is not required that there be an allegation that the controlling person actually participated in the underlying primary violation).  Plaintiffs do need, however, to allege facts beyond a defendant's position or title that show the defendant had power or control over the controlled person.  Dennis v. General Imaging, Inc., 918 F.2d 496, 509-510 (5th Cir.1990).

As discussed above, plaintiffs have adequately stated a claim against Canty, Welch, and Stone under section 10(b) of the Exchange Act.  Accordingly, § 20(a) liability will attach for the

27

defendants who exercised or had the power to exercise control over Canty, Welch, and/or Stone.

Plaintiffs' allegations regarding the individual defendants' power and control at Stone are as

follows:

> <u>Canty</u>:  By virtue of his positions as CEO, President, Director and consultant during the Class Period, and his day-to day involvement in the management and operation of Stone and, in particular, his hands-on involvement in determining the proved reserves that were recorded in Stone's SEC filings and public statements to investors ... Canty was a controlling person of the Company and exercised his power and influence to cause Stone to engage in the wrongful conduct complained of herein.[45]

> <u>Welch</u>:  By virtue of his positions as CEO and Director during the Class Period, and his day-to day involvement in the management and operation of Stone, Welch was a controlling person of the Company and exercised his power and influence to cause Stone to overstate its reported proved reserves and to materially misstate its financial results.[46]

> <u>Prince</u>: Defendant James H. Prince served as Stone's CFO since August 1999, and Executive Vice President since April 2004[47]...  By virtue of his senior executive and officer positions at Stone and day-to-day involvement in the management and operation of Stone... Prince was a controlling person of Stone and exercised his power and influence to cause Stone to engage in the wrongful conduct complained of herein.  Prince, along with defendants Canty and Welch during their respective years as CEO, was principally responsible for the Company's communications to securities analysts and investors from May 2, 2001 through at least July 2005[48]... Prince along with Canty and Welch during their respective years as CEO, was responsible for ensuring the accuracy of Stone's financial reports and filings with the SEC, for the fiscal years 2001, 2002, 2003, and 2004.[49]

> <u>Beer</u>: By virtue of his positions as Senior Vice President and CFO, and his day-to-day involvement in the management and operation of Stone, Beer was a controlling

---

[45] Rec. Doc. 61 at Paragraph 19(c).

[46] Rec. Doc. 61 at Paragraph 20(b).

[47] Rec. Doc. 61 at Paragraph 21(a).

[48] Rec. Doc. 61 at Paragraph 21(b).

[49] Rec. Doc. 61 at Paragraph 21(c).

28

person the Company and exercised his power and influence to cause Stone to overstate its reported proved reserves and to materially misstate its financial statements.  Beginning in August 2005, Beer was principally responsible for the Company's communications to securities analysts and investors... Beer, along with Welch, was responsible for ensuring the accuracy of Stone's financial reports and filings with the SEC, for the quarter ended June 30, 2005.[50]

The undersigned concludes that plaintiffs have alleged sufficient facts regarding the power of control held by Canty, Welch, Prince, and Beer.  These defendants were officers and/or directors of Stone.  They were responsible for the accuracy of Stone's SEC reports.  Moreover, they signed the company's SEC filings and certified the accuracy of the information.  Furthermore, plaintiffs have alleged that defendants had direct and substantial involvement in the day-to-day operations of Stone.  Considering these allegations, the undersigned concludes that plaintiff has adequately alleged that Canty, Welch, Prince, and Beer were "controlling persons" under § 20(a) of the Exchange Act.[51]

Based on these facts and giving plaintiffs the benefit of all reasonable inferences, it is therefore recommended that defendants' motions to dismiss the § 20(a) claims be denied.

### IV.  Conclusion

Considering the foregoing,

---

[50] Rec. Doc. 61 at Paragraph 22(b).

[51] Although defendants argue that Canty and Welch cannot be held liable under § 20(a) for their own underlying misstatements or fraudulent conduct, the claims against these defendants under § 20(a) should remain since the defendants may be liable for the actions of other defendants.

29

**IT IS RECOMMENDED** as follows:

1.    that the motions to dismiss be **GRANTED** in part, dismissing plaintiffs' claims against Prince and Beer under §10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5;

2.    that the motions to dismiss be **GRANTED** in part, dismissing the claims of plaintiffs who sold their shares before the October 6, 2005 disclosure by Stone of the reserve errors;

3.    that the motions to dismiss be **DENIED** as to all other claims asserted by plaintiffs.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within ten (10) days after being served with a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  See Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir.  1996).**

Signed at Lafayette, Louisiana, on August 16, 2007.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)