**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE-OPELOUSAS DIVISION**

|  |  |
|---|---|
| IN RE STONE ENERGY CORP.<br>SECURITIES LITIGATION | CIVIL ACTION NO. 6:05-CV-2088 (LEAD)<br>6:05-CV-2109 (MEMBER)<br>6:05-CV-2220 (MEMBER)<br><br>JUDGE TUCKER L. MELANCON<br>MAG. JUDGE MILDRED D. METHVIN |

**REPLY DECLARATION OF SCOTT D. HAKALA, PH.D, CFA**
**REGARDING THE DEFENDANTS' MEMORANDUM IN OPPOSITION TO**
**CLASS CERTIFICATION AND DEFENDANTS' MOTION TO EXCLUDE**

## <u>TABLE OF CONTENTS</u>

I.    GENERAL SUMMARY………………………………………………………    1

II.   COMMENTS ON DEFENDANTS' OPPOSITION MEMORANDUM……………    4

   **Defendants Do Not Acknowledge the Direct Support for the Loss Causation
   Analyses in Hakala Expert Report**…………………………………………….…    4

   **The Hakala Expert Report Accounts for Defendants' Asserted Alternative Causes
   for Investor Losses** ………………………………………………..……………..    6

   **The Economic Relevance of Shareholder Losses in February and March 2006
   is Established**……………………………………………………...…………...    10

   **The Fischel Report Does Not Support Defendants' Assertions Due to
   Insufficient and Erroneous Analyses** …………………………………………..    12

III.  COMMENTS ON DEFENDANTS' DAUBERT MEMORANDUM………………    13

   **Extensive Academic and Empirical Support for the Event Study
   Methodology**………………………………………………………………...........    13

   **Substantial Reasoned Bases for the Loss Causation Conclusions**…………..........    22

   **Support for Deposition Testimony Regarding Loss Causation Analyses**...……..    24

   **Implementation of the Analyses was Sound and Produced Correct
   Conclusions**……………………………………………………………………........    27

   **Defendants' References to Court Rulings in Other Matters are Inaccurate,
   Incomplete, and Inconsistent with Other Prior Court Rulings**……....................    30

IV.   COMMENTS ON THE FISCHEL REPORT………………………………………    32

   **Demonstration of Inflation per Share During the Class Period**………………..    32

   **Corrective Disclosures Caused Significant Stock Price Declines**………………    34

       *October 6 and 7, 2005*........................................................................    35

       *February 21, 2006*………………………………………………………    40

       *March 10 and 13, 2006*……………………………………...………………..    41

**EXHIBIT LIST**

G.       STONE ENERGY NEWS EXCERPTS

H.       COMPARISON OF STONE ENERGY SHARE PRICE WITH AVERAGE
         OF 13 GULF COAST PEERS

I.       COMPARISON OF STONE ENERGY SHARE PRICE WITH AVERAGE
         OF 6 GULF COAST PEERS IN HAKALA EXPERT REPORT

J.       MATTERS WITH FAVORABLE DECISIONS WITH RESPECT TO DR.
         HAKALA'S TESTIMONY

K.       EXPERT REPORT OF M. LAURENTIUS MARAIS IN *BROADCOM* (w/o
         Exhibits)

L.       DECLARATION OF M. LAURENTIUS MARAIS IN *OMNICOM* (w/o
         Exhibits)

## I.    GENERAL SUMMARY

1.    I incorporate by reference and hereby do affim the analyses and opinions set forth in the Corrected Expert Report of Scott D. Hakala, Ph.D., CFA regarding Market Efficiency and Loss Causation ("Hakala Expert Report"), and the Deposition of Scott Hakala ("Hakala Tr.") on June 18, 2008 in this matter.  In addition to the information considered in the Hakala Expert Report, I considered in this declaration the information, narratives and exhibits in the Report of Daniel R. Fischel ("Fischel Report"), a Draft Transcript of the Deposition of Daniel R. Fischel taken July 16, 2008 ("Fischel Deposition"), the Memorandum of Defendants Stone Energy Corporation, David H. Welch, James H. Prince, and Kenneth H. Beer in Opposition to Plaintiff's Motion for Class Certification ("Defendants' Opposition Memorandum"), and Defendants' Memorandum of Law in Support of Motion to Exclude Reports and Testimony of Scott D. Hakala, Ph.D., CFA ("Defendants' Daubert Memorandum").

2.    In this Reply declaration, I affirmatively respond to the various points made in the Defendants' Opposition Memorandum, Defendants' Daubert Memorandum, and the Fischel Report.  The major points in this declaration are as follows:

    a.    In the Hakala Expert Report (pp. 13-20 at ¶¶19-27), event study analyses were performed using a generally accepted methodology ("intervention analysis") that results in reliable estimates of the effects of certain events and their statistical significance ("relative importance" or "confidence" from a statistical standpoint).  The specific methodology implemented in the Hakala Expert Report has been mentioned in numerous recognized (peer-reviewed)

academic texts and peer-reviewed articles as a superior event study methodology. (Hakala Expert Report, on pp. 13-19 at footnotes 9-10 and 13-18) The specific methodology has also been peer-reviewed by a recognized, published expert (see Exhibits K and L to this declaration) and has been extensively tested and shown to be reliable and unbiased. Additionally, a number of courts have rejected *Daubert* motions or similar arguments seeking to exclude or reject this event study methodology (Hakala Expert Report, footnote 1, p. 4).

b.  The event study analyses in the Hakala Expert Report found statistically significant declines in Stone Energy's share price on: October 6 and 7, 2005; February 9, 13 and 21, 2006; and March 10 and 13 combined, and on March 13, 2006. (Hakala Expert Report Exhibits D-1 and D-2) Each of these events is specifically linked to disclosures of information relating directly to the alleged fraud in this case.

c.  In addition to performing an event study, the generally accepted methods for analyzing events and determining loss causation are: (i) deductive reasoning (ruling out alternative causes, applying logic and economic principles to establish the most likely cause of the losses) set forth in the Hakala Expert Report (pp. 6-7, and 22-28 at ¶¶6 and 29-39); (ii) financial analyses (analyzing the financial impacts and relative components of the events to isolate loss causation in Hakala Expert Report Exhibit E and pp. 22-28 at ¶¶31-39); (iii) valuation analyses (determining based on valuation methods that the loss was attributable to the alleged fraud in Hakala Expert Report

Exhibit E and pp. 22-24 at ¶¶31 and 33); and (iv) review of contemporaneously published information (such as analyst reports in Exhibit F to the Hakala Expert Report and news reports in Exhibit G to this declaration) to determine the reasons for the losses based on comments by market participants and commentators. Using each of these four generally accepted methods for analyzing the statistically significant events, the event analyses established that the primary cause of the approximately 14% relative decline in Stone Energy's share price on October 6 and 7, 2005 was due to the reserve revisions that are the subject of the alleged fraud in this case. Similarly, the 4.6% relative decline in Stone Energy's share price on February 21, 2006 was linked directly to the foreseeable consequences of the reserve revisions; and the relative losses realized by investors on March 10 and 13, 2006 were linked to the first restatements of Stone Energy's financial statements and first reports of the valuation of the revised reserves and not other causes.

d. The Defendants' posited potential alternative causes (damages resulting from Hurricanes Katrina and Rita and production issues) for investor losses on October 6 and 7, 2005 and between October 6, 2005 and March 14, 2006 could not explain more than a portion of the approximately 14% relative decline in Stone Energy's share price on October 6 and 7, 2005, and the greater than 20% relative total losses realized by investors between October 6, 2005 and March 14, 2006. These alternative causes are accounted for in the analysis of investor losses using deduction, financial and valuation analyses of

the magnitude of the effects of these posited alternative causes on reserves and production, and based on the comments of analysts (Exhibit F to the Hakala Expert Report) and news reports (Exhibit G to this declaration).

e.  Finally, this declaration responds to the other criticisms in Defendants' Opposition Memorandum and Defendants' Daubert Memorandum.  The criticisms of the methods employed and the implementation of those methods in the Hakala Expert Report are inaccurate, invalid and/or immaterial. Likewise, Defendants references to court ruling in other matters are inaccurate or incomplete, as shown by the cases listed in Exhibit J to this Reply declaration.

## II.    COMMENTS ON DEFENDANTS' OPPOSITION MEMORANDUM

### Defendants Do Not Acknowledge the Direct Support for the Loss Causation Analyses in Hakala Expert Report

3.    The generally accepted starting point for a loss causation and damages analysis in securities litigation is an event study.[1]  As set forth in the Hakala Expert Report (pp. 13-20 at ¶¶19-27), a comprehensive and detailed event study analysis found statistically significant declines in Stone Energy's relative share price on October 6 and 7, 2005, February 9 and 13, 2006, February 21, 2006 and March 13, 2006, and over the two-day period of March 10 to 13, 2006.  As discussed in the Hakala Expert Report (pp. 13-19 at footnotes 9-18), the "intervention analysis" event study method is widely recognized in the peer-reviewed

---

[1] Cornell and Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review*, June 1990, pp. 899-900; Koslow, "Estimating Aggregate Damages in Class Action Litigation Under Rule 10b-5 for Purposes of Settlement," *Fordham Law Review*, April 1991, pp. 819-825; and Finnerty and Pushner, "An Improved Two-Trader Model for Estimating Damages in Securities Fraud Class Actions," *Stanford Journal of Law, Business and Finance*, 2003, pp. 218-221.

academic literature and the specific implementation and statistical inferences based on that study are recommended in widely regarded peer-reviewed texts and articles on statistics, econometrics and financial markets. Additionally, later in this Reply declaration in response to Defendants' Daubert Memorandum, I provide extensive additional discussion of the academic support for each aspect of the event study analysis and the interpretation of the event study analysis.

4.    Once the event study has been completed, it is generally accepted that additional analyses may (and sometimes should) be performed to analyze the events in question. (Hakala Tr. 93:5-96:24)   These additional analyses typically included: (i) deductive reasoning (ruling out alternative causes and applying logic and expertise to interpret the events); (ii) financial analyses (ascertaining the relative financial implications of the fraud and non-fraud-related information for specific time periods); (iii) valuation analyses (examining how the security was valued at various points in time and determining how the fraud and non-fraud related information would have affected the security and then, when disclosed, did affect the price of that security); and (iv) consideration of contemporaneously published comments by security analysts, investors and news reports.[2]   The Hakala Expert Report (pp. 22-28 at ¶¶29-40) considered all four additional analyses in reaching the conclusion that the "primary" cause of the decline in Stone Energy's share price on October 6 and 7, 2005 and between October 6, 2005 and March 14, 2006 was attributable to the reserve revisions and not some other cause. (Hakala Tr. 111:2-18, 111:25-112:20)

5.    Specifically, the primary method of valuing Stone Energy was based on the net asset value of its proved oil and gas reserves. (Hakala Tr. 112:17-113:22; Hakala Expert Report

---

[2] See, for example, Cornell and Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review*, June 1990, pp. 894-897.

pp. 23-24 and 27-29 at ¶33-34 and 37 and Exhibits E and F)  The reserve revisions disclosed would explain the decline in Stone Energy's relative share price on October 6 and 7, 2005 and between October 6, 2005 and March 14, 2006. (Hakala Expert Report Exhibit E.) Additionally, analyst and news reports linked the reserve revision to the substantial decline in Stone Energy's relative share price, as shown in the analyst report excerpts in Exhibit F to the Hakala Expert Report and the news report excerpts in Exhibit G to this declaration.  Thus, financial analyses, valuation analyses, and news and analyst reports all support the conclusion that the reserve revision was the primary cause of the relative decline in Stone Energy's share price on October 6 and 7, 2005 and between October 6, 2005 and March 14, 2006.

**The Hakala Expert Report Accounts for Defendants' Asserted Alternative Causes for Investor Losses**

6.      In contrast, alternative causes can be ruled out as sufficient to explain the magnitude of the relative decline in Stone Energy's share price on October 6 and 7, 2005 and between October 6, 2005 and March 14, 2006.  Production shortfalls attributable to Hurricanes Katrina and Rita and much of the damage to structures and reduced production caused by the hurricanes had already been disclosed and were otherwise known in late August and September 2005.  (Hakala Expert Report pp. 6-7, and 23 at ¶¶6 and 32.)  Production shortfalls due to temporary losses in production associated with hurricanes will only have a temporary and more muted negative stock price effect associated with the non-insured costs of repairs and the time value associated with delays in ramping up production.  (Hakala Tr. 113:19-115:1.) The additional disclosures of reserve reductions associated with hurricane damage on October 6, 2005 represented only 1.2% of total reserves as compared with a 19.1% reduction in reserves due to prior misstatements of proved reserves.  (Hakala Expert

Report pp. 6-7, and 23-24 at ¶¶6 and 33.)

7.    To further illustrate this fact and in response to Defendants' arguments, I have prepared charts in Exhibit H and Exhibit I to this declaration comparing the stock price of Stone Energy with the average share prices of thirteen peer companies[3] in Exhibit H and six peer companies in Exhibit I[4] with substantial Gulf of Mexico oil and gas exploration and production. Many of the peer companies experienced significantly greater relative losses in production and apparent losses in reserves as a result of hurricane damage and had other operational difficulties. Yet, the charts demonstrate that Stone Energy's share price declined significantly more than the peer companies on October 6 and 7, 2005 and declined further relative to the peers in February and March 10 to 14, 2006. Overall, Stone Energy's relative share price closely matched the average price of the peers on October 3, 4 and 5, 2005, but fell in excess of 26% more than the average peer share price (adjusted for dividends) between October 6, 2005 and March 14, 2006 in Exhibit H.

8.    In the context of the information summarized in the prior three paragraphs, Defendants' Opposition Memorandum fails to acknowledge and consider the rational and generally accepted bases for the conclusions reached in the Hakala Expert Report and the corroboration of those conclusions in a number of analyst and news reports for the decline in Stone Energy's share price on October 6 and 7, 2005 and between October 6, 2005 and

---

[3] These were identified based on analyst and news report with all but one company identified by Stone Energy as a peer company in its Form 14 A, Proxy Statements, filed on March 31, 2005, p. 16. The specific companies were: Comstock Resources Inc. (CRK); Energy Partners Ltd. (EPL); The Houston Exploration Company (THX); W&T Offshore (WTI); Cabot Oil & Gas (COG), Forest Oil (FST), The Meridian Resource Corporation (TMR), Newfield Exploration Company (NFX), Noble Energy (NBL), Pogo Producing Company (PPP), St. Mary Land & Exploration (SM); Swift Energy Company (SFY); and XTO Energy Inc. (XTO).

[4] The peer companies in Exhibit I were companies considered in the analyses in the Hakala Expert Report: Comstock Resources Inc. (CRK); Energy Partners Ltd. (EPL); The Houston Exploration Company (THX); Newfield Exploration Company (NFX); St. Mary Land & Exploration (SM); and Swift Energy Company (SFY);

March 14, 2006. (Hakala Expert Report Exhibit F and Exhibit G to this declaration.) In this context, certain assertions in Defendants' Opposition Memorandum as to the reasons for the decline in Stone Energy's share price on October 6 and 7, 2005 are factually incorrect.

9.      For example, Defendants' Opposition Memorandum asserts (p. 5) incorrectly that, "Like Stone's, the stock prices of virtually all publicly traded oil and gas companies operating in the Gulf of Mexico declined dramatically on October 6, 2005 as part of a continuing drop in oil and gas prices (the 'Oil and Gas Price Decline')." However, the stock prices of 13 peer companies set forth in Exhibit H to this declaration fell on average only 3.7% on October 6 and rose 2.0% on October 7, 2005. By comparison, Stone Energy's share price fell 14.1% on October 6 and another -0.4% on October 7, 2005. Consistent with this, the event study analyses in the Hakala Expert Report Exhibits D-1 and D-2 found that Stone Energy's relative share price fell 11.0% more than predicted based on the peer indices on October 6 and 2.7% more than predicted based on the peer indices on October 7, 2005, and both declines in Stone Energy's share price were statistically significant with a high degree of confidence (greater than a 99.99% degree of confidence on October 6 and 99.0% degrees of confidence on October 7, 2006). The news articles cited in footnote 5 on page 5 of Defendants' Opposition Memorandum actually refer to industry stock price declines on October 4 and 5, 2005, and not October 6 and 7, 2006. Importantly, I understand from Mr. Fischel's deposition that he does not dispute the price of Stone stock dropped following the October 6 announcement in a statistically significant amount independent from market and industry forces.

10.     Additionally, the assertions regarding market knowledge of hurricane damages in Defendants' Opposition Memorandum (pp. 13-14) are inconsistent with the news and analyst

reports cited in Hakala Expert Report (pp. 6-7, and 23 at ¶¶6 and 32) in that the hurricane damages were disclosed in large part in a series of disclosures by Stone Energy, posted production information from Stone Energy, and analyst reports between August 29 and September 29, 2005. As shown in Exhibit H to this declaration and Exhibits B-1 and B-3 to the Hakala Expert Report, the decline in Stone Energy's share price on October 6 and 7, 2005 was unique to Stone Energy and does not correspond with the average (or even specific share prices) of Stone Energy's peers.

11.     Defendants' Opposition Memorandum (pp. 15-16) misstates my testimony regarding the effect of the hurricanes on Stone Energy's share price both before and on October 6, 2005. I acknowledged that the hurricane damage negatively affected Stone Energy's relative share price between August 29 and October 3, 2005 and that some additional impact on October 6, 2005 was possible. (Hakala Expert Report pp. 6-7 and 23-24 at ¶¶6, 32, and 33; Hakala Tr. 110:19-111:18, 115:6-18.) However, the incremental disclosure of hurricane damage on October 6, 2005 does not explain more than a portion of the magnitude of Stone Energy's relative share price decline on October 6 and 7, 2005. (Hakala Expert Report pp. 6-7 and 23-24 at ¶¶6, 32, and 33; Hakala Tr. 110:19-111:18, 115:6-18.)

12.     In this context, the reliance of the Defendants' Opposition Memorandum (p. 15) on anecdotal evidence is misplaced. Reliance on disclosure events from two companies -W&T Offshore and The Houston Exploration Co. (based on the Fischel Report) - is improper in that Mr. Fischel performed or provided no event study analyses on these two companies to determine the relative decline in each company's share price attributable to hurricane damage (as opposed to some other cause) and the relative damage to reserves and production each company realized in comparison with Stone Energy was not considered. The relative decline

in The Houston Exploration's share price relative to its peers was only 3.6% on October 18, 2005 and a substantial portion of that decline, according to The Houston Exploration Co.'s press release, was attributable to other operating problems, not to hurricane damage.  The damage disclosed by W&T Offshore was not expected and was extremely severe on October 3, 2005 *(loss of 90% of production temporarily)*.  By contrast, Stone Energy's production by the fourth quarter of 2005 was down only 26% as a result of hurricane damage.  Thus, W&T Offshore suffered substantially greater relative damage from hurricanes than Stone Energy and was much later than Stone Energy in revealing that damage.  Adjusting for this discrepancy (and especially without an event study), W&T Offshore's share price decline of 7.5% on October 3, 2005 does not explain the substantially greater relative share price decline of almost 14% experienced by Stone Energy on October 6 and 7, 2005.  Similarly, although Defendants' Opposition Memorandum (p. 15) correctly notes Stone Energy experienced a 2.15% relative stock price decline on October 8, 2004 in connection with the disclosure of damage caused by Hurricane Ivan, it ignores the fact that, by contrast, greater relative declines in Stone Energy's share price had occurred in August and September 2005, well before October 6, 2005 (on August 29 and 30, 2005), and Stone Energy had already provided similar information regarding the damage from hurricanes to analysts and investors in September 2005.

*The Economic Relevance of Shareholder Losses in February and March 2006 is Established*

13.     Defendants' Opposition Memorandum also discounts the relevance of the statistically significant declines in Stone Energy's relative share price in February and March 2006, particularly on February 21 and March 13, and over the two day period of March 10 and 13, 2006.   The information and concerns of analysts and investors on those days related

significantly to the valuation of reserves, including the assumed ability of the Company to successfully generate additional proved reserves over time to offset production losses as well as the timing of the production from proved reserves. Contrary to the assertions in the Defendants' Opposition Memorandum (p. 18), information relating to the valuation of the reserves and the extent to which the revisions represented prior misstatements were not disclosed until the evening of March 9 through March 13, 2006.

14.    The 4.6% relative decline in Stone Energy's relative share price on February 21, 2006, the next trading day after Stone announced notice of receipt of non-compliance from bondholders, was extremely statistically significant (Hakala Expert Report, Exhibits D-1 and D-2), with virtually no possibility that the decline was due to chance. I understand from Mr. Fischel's deposition that he does not dispute that Stone's stock price fell on February 21, 2006 in a statistically significant amount independent of market and industry forces. Additionally, consistent with an efficient market, a portion of this relative decline occurred between the close of trading on February 17 and the opening of trading on February 21, 2006 (after controlling for market and industry forces). Furthermore, according to news reports, the decline in Stone Energy's share price on February 21, 2006 related to investor's concerns regarding the effect of the reserve revisions in reducing the <u>value</u> of proved reserves (not already corrected) and, thus, on Stone Energy's creditworthiness and access to debt.[5]

15.    Similarly, while (contrary to the assertion in Defendants' Opposition Memorandum on p. 20) there was positive news announced late on March 9, 2006 in that Stone Energy

---

[5] According to *Platt's Oilgram*, February 22, 2006, p. 3, "Shares of the Lafayette, Louisiana-based E&P fell 2.8% as Stone announced receipt of notice of non-compliance from bondholders for failure to revise four years of financials while it investigates the reserve declines first revealed in October (ON 12/15/05)."; "The turmoil of the reserve revisions have played havoc with Stone's stock price, which hit a 52-week high of $62.50/share just before the October warning and finished Feb 21 at $42.95."

earned greater revenue in the fourth quarter of 2005 than expected by analysts,[6] the disclosures regarding the restated financial statements and production guidance provided for the first time restated financial statements that incorporated the fair value estimates of the proved reserves. Thus, the negative news on March 10 and the negative analyst and investor reaction to that news resulted in a statistically meaningful decline in Stone Energy's relative share price on March 10, 2006 (despite positive offsetting news related to revenues) and a statistically significant decline in Stone Energy's relative share price on March 13. The statistically significant relative decline in Stone Energy's relative share price over the two trading days of Friday, March 10 and Monday, March 13, 2006 related to the valuation of reserves (the timing of future production from the proved reserves and the consequent fair value assumption for those reserves) and the associated restatement.

### The Fischel Report Does Not Support Defendants' Assertions Due to Insufficient and Erroneous Analyses

16.     To the extent Defendants' Opposition Memorandum relies on the Fischel Report, that report does not provide a reliable and comprehensive analysis of the relative movements of Stone Energy's share price or a systematic review of all of the relevant news and analyst reports. Additionally, the Fischel Report fails to perform any financial or valuation analyses or to consider the fact that oil and gas exploration and production companies are generally valued based on their proved reserves and ability to develop additional proved reserves and generate timely production from proved reserves. Finally, there are a number of conceptual errors in the Fischel Report, especially with respect to the declines in Stone Energy's relative share price prior to October 6, 2005. Particularly, in light of the fact that he did not submit

---

[6] Revenues for the fourth quarter of 2005 were $135.6 million as compared with a First Call analysts' consensus estimate of $130 million. *Dow Jones Newswire*, March 9, 2006, at 19:15. The earnings expectation discussion in Defendants' Opposition Memorandum is dated and inconsistent with the fact that Stone Energy's revenues were better than expected.

an event study, Mr. Fischel generally fails to consider whether certain stock price movements were company-specific movements differentiated from market or industry forces. The anecdotal evidence from other peers discussed in the Fischel Report provides no detailed analyses of the causes of the stock price declines, nor is their comparability to Stone Energy discussed. As shown in Exhibit F to the Hakala Expert Report and Exhibit G to this declaration, Mr. Fischel's views are contradicted by a number of analyst reports and news reports that attributed the decline in Stone Energy's share price on October 6 and 7, 2005 and between October 6, 2005 and March 14, 2006 primarily to the revision of Stone Energy's reserves and not primarily to damages associated with hurricanes. Without the submission of a comprehensive event study analysis, including systematic reviews of analyst reports and news reports, Mr. Fischel's view ignores the fact that investors, at least partially, were aware of and considered the hurricane damage to Stone Energy's production and reserves prior to October 6, 2006. To the extent investors had already anticipated and understood much, if not most, of the hurricane damage to Stone Energy prior to October 6, 2005, then the disclosures associated with hurricane damage on October 6, 2005 would be partially anticipated and could not explain more than a portion of the total relative decline in Stone Energy's share price on October 6 and 7, 2005.

## III.    COMMENTS ON DEFENDANTS' DAUBERT MEMORANDUM

### Extensive Academic and Empirical Support for the Event Study Methodology

17.    The specific event study approach in the Hakala Expert Report is referred to by various sources as "intervention analysis," the "event-parameter" method, "observation-specific" method, and "integrated method" in the academic literature. The academic foundations for the use of intervention analysis in event studies consistent with the Hakala

Expert Report are set forth in the Hakala Expert Report (pp. 13-14 and 16-19 at ¶¶20 and 23-24 and in footnotes 9-10 and 13-18).  Event study analyses are a subset of a broader set of statistical analyses generally referred to in the academic literature as "intervention analysis."  This methodology was popularized in a 1975 paper by Box and Tiao, "Intervention Analysis with Applications to Economic and Environmental Problems," *Journal of the American Statistical Association*, March 1975, pp. 70-79.  It was first mentioned in the context of event studies in Larcker, Gordon and Pinches, "Testing for Market Efficiency: A Comparison of the Cumulative Average Residual Methodology and Intervention Analysis," *Journal of Financial and Quantitative Analysis*, June 1980, pp. 267-287.  Since that time numerous academic papers have employed "intervention analysis" in the context of event studies.

18.    Each step of the event study analyses employed in this case is specifically recommended in the academic literature.  First, I identified company-specific (Stone Energy-specific) news events that fit within pre-determined lists of the kinds of news that "may" be material.[7]  The academic literature has repeatedly recognized the importance of this step in the "ideal" event study process and the necessity of making reasoned or economic judgments in formulating the exact statistical model and choosing the events to consider in the analysis.[8]

---

[7] Hakala Expert Report (pp. 13-14 at ¶10 and footnote 10) provides the objective lists of material news events and the bases for selecting events.

[8] Box and Tiao, "Intervention Analysis with Applications to Economic and Environmental Problems," *Journal of the American Statistical Association*, March 1975, p. 78, states, "In practice, it is perhaps more often the case that a response at a given point of time depends on events, both known and unknown, which have occurred not necessarily coincidentally but over the recent past. Statistical methods have, in a word, "lacked memory." The dynamic characteristics of both the transfer function and the noise parts of the model have tended to be ignored. The application of time series methods can amend this situation. This is illustrated in this article in the particular case where the object is to study the possible effect of interventions in the presence of dependent noise structure."  This articles specifically supports the entire event study method employed in this case in that it, (i) specifically recommends identifying and controlling for "events" that occur over time; (ii) allows for the liberal identification and use of events in explaining movements in stock prices; and (iii) recognizes that this issue is often "tended to be ignored" in the academic literature but is an important part of the time series.  Similarly, Larcker, Gordon and Pinches, "Testing for Market Efficiency:  A Comparison of the Cumulative Average Residual Methodology and Intervention Analysis," *Journal of Financial and Quantitative Analysis*, June 1980, p. 267, states, "The objective of this paper is to suggest that the  traditional CAR methodology is often

*Reply Declaration of Scott D. Hakala, Ph.D., CFA*
*Regarding Defendants' Opposition to Class Certification*                14

In fact, a number of academic sources recognize that this method is superior to the alternative event study methods recognized in the academic literature and that the identification of significant events is important in accurately estimating and testing the statistical  model.[9]

---

inappropriate and that intervention analysis is a possible alternative. Where the systematic risk (i.e., ß) of a firm changes as the result (or in anticipation) of an announcement, the cumulative average residual methodology will result in biased residuals. Analysis of this biased residual pattern does not provide an appropriate basis for making statements about the information content of the announcement or market efficiency. <u>Intervention analysis, on the other hand, can separate such risk changes from the information content of the announcement. In addition, intervention analysis also allows the observed autocorrelation in the market model residuals to be removed, thus providing improved ß estimates required for reliable statistical testing.</u>" (underline added) Larcker et al. further refer to the Box and Tiao 1975 paper as specifically applicable to event studies, stating (p. 272), "Financial announcements may be viewed as an intervention, where the term intervention refers to an event occurring between the beginning and end of some time series. Box and Tiao have developed a general class of stochastic models which incorporate the possibility of a change in the process due to interventions." and noting (p. 282), "The primary advantage of intervention analysis in the case of nonstationary B's and excess risk-adjusted returns is that the traditional methodology presents results which are confounded while intervention analysis disentangles the results…. Hence, while the traditional CAR methodology may lead to the same conclusion as intervention analysis, it provides less information due to the confounding that may occur." and (p. 285) "The primary advantages of intervention analysis are: (1) the ability to specifically test for a shift in the return series as distinct from risk changes, (2) the ability to remove autocorrelation, and (3) the necessity to consider each security on a case-by-case basis instead of forcing one model on all securities. The first two advantages have already  been discussed. The final advantage of intervention analysis is that it forces consideration on a case-by-case basis."  Thus, Larcker et al., 1980, specifically recommend the event study methodology I employed as superior to the alternatives and even recommend that (p. 274), "the intervention variable (d) must be specified in advance" consistent with the first step of my event study analysis, as discussed in Hakala Expert Report on pp. 36-37 at ¶48.  Finally,  Franses in *Time Series Models for Business and Economic Forecasting*, 1998, recommends "intervention" analysis (p. 130) consistent with Box and Tiao (1975) and points out the statistical problems that arise when one does not capture the effects of known events (with dummy variables) or "neglects them" (pp. 128-129). He states (p. 144), "With *a priori* knowledge of specific events and approximate dates which may yield aberrant observations (…), it is not difficult to examine their relevance for a model that will be used for forecasting. We can simply extend our model with additional regressors, such as the dummy variables…"

[9] Hakala Expert Report pp. 16-17 at ¶23 and footnotes 13 and 14.  See, for example, Larcker, Gordon and Pinches, "Testing for Market Efficiency:  A Comparison of the Cumulative Average Residual Methodology and Intervention Analysis," *Journal of Financial and Quantitative Analysis*, June 1980, pp. 267, 282 and 285; Higgins, "Power of One and Two Sample T-Statistics Given Event-Induced Variance Increases and Non-normal Stock Returns: A Comparative Study," *Quarterly Journal of Business and Economics*, Winter 1998, "These variance increases can cause problems when using the traditional one sample t-statistic to test for abnormal returns. <u>One sample t-statistic will reject the null hypothesis of no abnormal returns too often when there are variance increases around an event.</u>" and "As Lehmann notes, the t-statistic is optimal only when the underlying sample distribution is normal. Therefore, when the underlying sample distribution is non-normal, the performance of the t-statistic becomes an empirical question." (emphasis added, the point of the article is the need to control for events and the effect of events causing the standard errors to be overstated and statistical significance understated); Franses, *Time Series Models for Business and Economic Forecasting*, 1998, pp. 128-130; Marais and Schipper, "Chapter 17A: Event Study Methods: Detecting and Measuring the Security Price Effects of Disclosures and Interventions," *Litigation Services Handbook: The Role of the Financial Expert*, Third Edition, 2005 Cumulative Supplement, Chapter 17A, pp. 18, and 22-23; and Aktas, de Bodt and Cousin, "Event Studies with a Contaminated Estimation Period," *Journal of Corporate Finance*, Vol. 13, 2007, pp. 130 and 139 (wherein he refers to my method as the "manual" or "brute force" method and demonstrates that, when feasible, the manual method is the "ideal" against which the alternative event study methods should be tested.

Furthermore, the academic literature recognizes that the selection of events prior to examining the data and based on economic criteria (consistent with Hakala Expert Report on pp. 13-14 at ¶20 and associated footnotes 9-10) is the preferred method for selecting events[10] and that it is better to be over-inclusive than under-inclusive at this step of the process.[11]

---

[10] Most specifically, see, for example, Larcker, Gordon and Pinches, "Testing for Market Efficiency: A Comparison of the Cumulative Average Residual Methodology and Intervention Analysis," *Journal of Financial and Quantitative Analysis*, June 1980, p. 274, "the intervention variable (d) must be specified in advance."; Franses, *Time Series Models for Business and Economic Forecasting*, 1998, pp. 129-130, and 144, "In this book, I adopt the contrasting view that outliers, or sets of these aberrant data in the form of breaking trends or level shifts, somehow convey important information which we would want to exploit explicitly for forecasting or for taking into account, prior to forecasting. Additionally, it is assumed that the practitioner has some *a priori* knowledge about the likely location and relevance of such data, or that some recursive technique is used indicating such patterns."; "With *a priori* knowledge of specific events and approximate dates which may yield aberrant observations (as I will assume below), it is not difficult to examine their relevance for a model that will be used for forecasting." (underline added)  More generally, see, for example, Kennedy, *A Guide to Econometrics*, Second Edition, 1987, pp. 68-69, "A specification search is best undertaken by beginning with a general, unrestricted model and then systematically simplifying it in the light of the sample evidence. This approach (deliberate 'overfitting') is preferred to/has more power than a search beginning with a very simple model and expanding as the data permit (see Harvey, 1981, pp. 183-187)."; "To avoid these problems a researcher usually tries to determine the correct set of explanatory variables. The first and most important ingredient in such a search is economic theory. If economic theory cannot defend the use of a variable as an explanatory variable, it should not be included in the set of potential independent variables. Such theorizing should take place before any empirical testing of the appropriateness of potential independent variables; this guards against the adoption of an independent variable just because it happens to 'explain' a significant portion of the variation in the dependent variable in the particular sample at hand." (underline added); Campbell, Lo and MacKinlay, *The Econometrics of Financial Markets*, 1997, p. 524, "But perhaps the most effective means of reducing the impact of overfitting and data-snooping is to impose some discipline on the specification search by *a priori* theoretical considerations. These considerations may be in the form of well-articulated mathematical models of economic behavior, or behavioral models motivated by psychological phenomena, or simply heuristic rules of thumb based on judgment, intuition, and past experience….All this suggests the need for an *a priori* framework or specification for the model before confronting the data. By proposing such a specification, along with the kinds of phenomena one is seeking to capture and the relevant variables to be used in the search, the chance of coming upon a spuriously successful model is reduced."

[11] Hakala Expert Report, p. 36 at footnote 22. See, also, for example, Kennedy, *A Guide to Econometrics*, Second Edition, 1987, pp. 68-69; Intriligator, *Econometric Models, Techniques, and Applications*, 1978, pp. 188-189, ("The asymmetry between the results in the two cases should be noted: excluding relevant variables yields biased and inconsistent estimators, while including irrelevant variables yields unbiased and consistent estimators. Thus, in terms of bias and consistency, it is better to include too many than to include too few explanatory variables. Such practice is not generally recommended, however, because of other problems that can arise with included irrelevant variables, namely multicollinearity, inefficiency, and reduced degrees of freedom. Considerable judgment, in fact, is called for in the specification of the model, balancing between including "too few" and "too many" variables. Theoretical justifications should be available for including each explanatory variable in the model, but it should be recognized that in a general equilibrium setting, where "everything affects everything else," theoretical considerations are not sufficient to justify including explanatory variables. In general, the best approach is to include only explanatory variables that, on theoretical grounds, directly influence the dependent variable and that are not accounted for by other included variables.") and Pindyck and Rubinfeld, *Econometric Models and Economic Forecasts*, 1991, pp. 162-166 ("If we are unsure of which explanatory variables ought to appear in a model, we face several trade-offs. The analysis shows that the cost of excluding a variable which should appear in the model is bias and inconsistency. The cost of adding one

Thus, each aspect of the process in the Hakala Expert Report of identifying and selecting events to include in the event study analysis is specifically acknowledged in the appropriate academic literature on the subject. Additionally, the method of selecting events was objectively verified (empirically tested) and validated using the widely accepted technique (the F-test) set forth in the academic literature.[12]

19.    All statistical analyses and, by extension, all event studies (in the identification of news events of interest and explanatory variables in general) require that judgments be made by the researcher or some other party as to whether to consider or not consider such events.[13] As long as the final judgments/statistical models are provided (in the list of events set forth in

---

or more irrelevant variables is loss of efficiency. If the number of observations is large, it seems reasonable to opt for the risk of adding irrelevant variables, because the loss of degrees of freedom is unlikely to be serious. If the number of observations is not large, however, loss of efficiency becomes serious. In general, the choice of model form must be made in terms of the bias-efficiency trade-off, with the result dependent on the objective. If accurate forecasting is the goal, minimizing mean square error is one reasonable objective, since it accounts for both bias and efficiency. Thus, we might estimate each of several alternative models over a given time period and compare the mean square errors associated with each.").

[12] See, for example, Cassidy, *Using Econometrics*, 1981, Chapter 10, particularly pp. 246-247 (discusses using an F-test to test for multiple dummy variables) and Kennedy, *A Guide to Econometrics*, Second Edition, 1987, p. 70 ("If we are dealing with the question of inclusion or exclusion of a set of variables, rather than a single variable, the $t$ value noted above must be an $F$ value.").

[13] In specific relation to event studies, financial market models and intervention analyses, see, for example, Box and Tiao, "Intervention Analysis with Applications to Economic and Environmental Problems," *Journal of the American Statistical Association*, March 1975; Larcker, Gordon and Pinches, "Testing for Market Efficiency: A Comparison of the Cumulative Average Residual Methodology and Intervention Analysis," *Journal of Financial and Quantitative Analysis*, June 1980, p. 274; and Franses, *Time Series Models for Business and Economic Forecasting*, 1998, p. 144; and Ryan and Taffler, "Are Economically Significant Stock Returns and Trading Volumes Driven by Firm-specific News Releases?" *Journal of Business Finance & Accounting*, Vol. 31(1) & (2), January/March 2004, p. 50. More generally, see, for example, Kennedy, *A Guide to Econometrics*, Second Edition, 1987, pp. 68-69; Intriligator, *Econometric Models, Techniques, and Applications*, 1978, p. 189 ("Considerable judgment, in fact, is called for in the specification of the model, balancing between including "too few" and "too many" variables."); Pindyck and Rubinfeld, *Econometric Models and Economic Forecasts*, 1991, pp. 162-166; and Campbell, Lo and MacKinlay, *The Econometrics of Financial Markets*, 1997, p. 524, "These considerations may be in the form of well-articulated mathematical models of economic behavior, or behavioral models motivated by psychological phenomena, <u>or simply heuristic rules of thumb based on judgment, intuition, and past experience</u>....All this suggests the need for an *a priori* framework or specification for the model before confronting the data. By proposing such a specification, along with the kinds of phenomena one is seeking to capture and the relevant variables to be used in the search, the chance of coming upon a spuriously successful model is reduced." (underline added)

Exhibits D-1 and D-2 to the Hakala Expert Report), the calculations can be adequately replicated and tested.[14]

20.     Finally, the specific criteria used in the Hakala Expert Report (pp. 17-19 at ¶24 and associated references in footnotes), for including and excluding events from the analysis and for determining statistical significance, are set forth in the academic literature and widely accepted.  The Hakala Expert Report analyzed the identified events both as a set and individually in a manner conforming to the academic literature and accepted practice.[15]

21.     Defendants' Daubert Memorandum asserts that: (p. 6) "Hakala deviates from the accepted methodology for event studies and instead uses an untested and unreliable method."; (p. 6) "Hakala's Methodology Has Not Been Subject to Peer Review and Publication"; and (p. 7) "Hakala uses what he calls 'dummy variables' to exclude days in which news about Stone may have affected the stock price."  However, as previously discussed and shown in Exhibits K and L to this declaration, the methodology employed in the Hakala Expert Report has been tested and peer-reviewed on multiple occasions and shown to be valid and consistent with the generally accepted concepts and methods in the statistics literature. (Hakala Tr. 40:6-41:13, 54:9-55:14, 265:11-18, 269:23-270:13.)   I understand that even Mr. Fischel acknowledged during his deposition that the use of dummy variables is appropriate under some (unspecified) circumstances.  The use of intervention variables ("dummy variables") is done within the context of the overall analysis such that those days are explicitly considered in the regressions and test statistics provided in Exhibits D-1 and D-2 to the Hakala Expert Report.  In that sense, those days are not "excluded" from the analysis, but are, in fact, explicitly considered and essential to the statistical results.

---

[14] Ibid.
[15] Hakala Expert Report pp. 17-19 at ¶24 and footnotes 15-18.

22.    Defendants' Daubert Memorandum similarly incorrectly asserts (p. 7) "The use of these dummy variables makes the company's stock price artificially track the movements of the selected indices more closely than would be the case if more dates with company information were retained. This in turn, has the effect of exaggerating the effect of the studied events." The use of dummy variables to control for company-specific news events eliminates a known bias and allows for more precise and unbiased tests of statistical significance.[16] The use of an F-test (summarized in Hakala Expert Report ¶27 and Exhibits D-1 and D-2) to verify the correctness and consistency of the selected events empirically establishes the validity of the analysis.[17] Thus, there is nothing "artificial" about the "goodness-of-fit" presented in the charts in Exhibits B-2 and B-3 and the event study summaries in Exhibits D-1 and D-2 of the Hakala Expert Report. Rather, as long as the events were chosen in advance of performing the analysis (a priori), the quality of the "goodness-of-fit" provided in Exhibits B-2, B-3, D-1 and D-2 is evidence that the underlying model and analysis is sound.[18] The basic principle in statistics is that a superior statistical model "encompasses" a more primitive statistical model by incorporating more information that was omitted in the primitive model.[19] A statistical analysis that captures more

---

[16] See, for example, Aktas, de Bodt and Cousin, "Event Studies with a Contaminated Estimation Period," *Journal of Corporate Finance*, Vol. 13, 2007, pp. 130 and 135; Franses, *Time Series Models for Business and Economic Forecasting*, 1998, pp. 128-130; and Larcker, Gordon and Pinches, "Testing for Market Efficiency: A Comparison of the Cumulative Average Residual Methodology and Intervention Analysis," *Journal of Financial and Quantitative Analysis*, June 1980, pp. 267, 272, 274, 282 and 285.

[17] See, for example, Cassidy, *Using Econometrics,* 1981, Chapter 10, particularly pp. 246-247 (discusses using an F-test to test for multiple dummy variables) and Kennedy, *A Guide to Econometrics*, Second Edition, 1987, p. 70 ("If we are dealing with the question of inclusion or exclusion of a set of variables, rather than a single variable, the *t* value noted above must he an *F* value.").

[18] See, for example, Kennedy, *A Guide to Econometrics*, Fifth Edition, 2003, Id. at 409, 413.

[19] See, for example, Kennedy, *A Guide to Econometrics*, Fifth Edition, 2003, Id. at 72, 95, 101.

information in an accepted manner is superior to and more reliable and precise than an analysis that fails to capture known information.[20]

23.    Defendants' Daubert Memorandum additionally asserts, (pp. 7-8) "In *Xcelera*,…, Judge Zobel rejected this methodology of Hakala's…"; "Hakala implicitly acknowledged that his approach in event study D-1 in this case uses the same methodology Xcelera rejected." In fact, the analysis in *Xcelera* was unique to that case, differs significantly from the analysis in this case, and is not applicable to the event studies provided in the Hakala Expert Report in this case.  (Hakala Tr. 32:16-21 cites lack of published news and analyst coverage led to reliance on investor comments on bulletin boards in *Xcelera* not considered in the event study in this case; 43:17-45:24 emphasizes that Exhibits D-1 and D-2 only controlled for selected events and not "all" events and selected events "*a priori*" based on peer-reviewed and published lists of the types of material events.)  In this case, only events determined based on economic criteria were included in the event study, not all events, and Exhibits D-1 and D-2 in the Hakala Expert Report demonstrate that the concerns of the court in *Xcelera* have no material affect on the conclusions in this case.  (Hakala Tr. 266:11-17.) As previously noted in this declaration and in footnotes, motions to preclude the implementation of the intervention analysis, event study methodology employed in this case have explicitly been rejected in *JDS Uniphase*,[21] *Clarent*,[22] *Raytheon* (May 18, 2004 ruling

---

[20] See, for example, Kennedy, *A Guide to Econometrics*, Fifth Edition, 2003, Id. at 85-86 (general comments on formulating a statistical model in advance and testing the model to verify its correctness consistent with the *a priori* selection of events on economic and theoretic grounds as performed in this case); pp. 108-109 (emphasizes the need for selecting a model and the variables-events in this case-on economic or theoretical grounds consistent with the manner selected in this case); Id. at.253-257 (provides for "observation-specific dummies" in the manner employed in intervention analysis in this case); and Id. at 409, 413 (provide for the statistical criteria for testing individual events and variables and for the use of joint tests to test a set of variables together for use in the analysis consistent with the manner employed in this case).
[21] Minute Order denying *Daubert* motions issued October 9, 2007, Transcript allowing trial testimony November 1 and 2, 2007.
[22] Transcript of *Daubert* Hearing, January 31, 2005, finding "plenty" of "science" p. 726:1 and ruling of the

"overruled" objection),[23] *Omnicom,*[24] and *Metris*[25] and implicitly rejected in a even greater number of other cases.[26]

24.    Defendants Memorandum finally asserts, (p. 8) "Hakala is forced to admit that not one of the articles he cites uses the same methodology."; "With no articles of his own, and no peer-reviewed publications that replicate his methodology on which he can rely. But Dr. Marais' purported peer-review is not published."  However, this misstates both my testimony and the academic citations. (Hakala Tr. 269:23-271:17; Exhibits K and L to this declaration.) As set forth in Hakala Expert Report (pp. 16-17 at footnotes 13-14), numerous peer-reviewed papers have recommended intervention analysis over the years as a legitimate and recommended statistical technique for modeling stock price movements, which specifically apply to the market model in event study analyses.  Aktas, de Bodt and Cousin, "Event Studies with a Contaminated Estimation Period," *Journal of Corporate Finance*, Vol. 13, 2007, pp. 129-145, is the latest peer-reviewed paper to replicate the methodology specific to event studies.  Larcker, Gordon and Pinches, "Testing for Market Efficiency: A Comparison of the Cumulative Average Residual Methodology and Intervention Analysis," *Journal of Financial and Quantitative Analysis*, June 1980, pp. 267-287, was the first peer-reviewed paper discussing and validating in general the intervention analysis methodology in the context of event studies.  Additionally, Franses, *Time Series Models for Business and*

---

inflation per share analysis (including event study methodology and damages per share) at p. 807:1-4, "Well, I believe based upon what has been 2 presented to me and based upon the filings in this case, I am 3 satisfied that you have met your burden with respect to Daubert 4 on the inflation issue."  Trial testimony February 9, 2005.

[23] Transcript of Proceedings, May 18, 2004, p. 33:14 "Overruled."  Case settled on before the beginning of the trial on the first day of trial.

[24] Transcript Regarding Hakala *Daubert* Motion, p. 32:19-20, "For the foregoing reasons, the defendant's motion to exclude the proposed expert testimony of Dr. Hakala is denied."

[25] Transcript of Proceedings, p. 44:1-1 "The *Daubert* motions are denied."

[26] For example, *In re Flag Telecom Sec. Lit.,* 2007 U.S. Dist. LEXIS 67173, (S.D.NY. Sept. 4, 2007); *Wagner v. Barrick Gold,* 2008 U.S. Dist. LEXIS 15811, (S.D.NY. Feb. 15, 2007) are recent decisions where Daubert-related criticisms were rejected.

*Economic Forecasting*, 1998, Chapter 6 specifically recommends the exact method I employ for estimating the market model in the event study while discussing the general statistical methodology (with event study analyses representing one specific application of the general method). Kennedy, *A Guide to Econometrics*, Fifth Edition, 2003, recommends generally each aspect of the statistic analyses performed in the Hakala Expert Report but in the broader context of time-series statistical analyses and statistical analyses in general. The same is true with Cassidy, *Using Econometrics*, 1981, pp. 250-253. That some of these texts recommend the intervention methodology for a broader set of statistical analyses, of which an event study is merely a single applied example of the implementation of the method, is irrelevant from an economic and statistical perspective to the issue of academic support.

25. With respect to the issue of peer reviews not being published, Dr. Marais has published peer-reviewed papers on event studies discussing the "event-parameter" approach and has issued opinions under oath attesting to the specific application I employed in this case and in two other cases, *In re Omnicom Sec. Litig.* and *In re Broadcom Sec. Litig.*, as provided in Exhibits K and L to this declaration.

### Substantial Reasoned Bases for the Loss Causation Conclusions

26. As previously explained, the event study analysis was the starting point for further loss causation analyses in the Hakala Expert Report (pp. 6-7, and 22-28 at ¶¶6 and 29-39). As noted in Cornell and Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review*, June 1990, pp. 894-897, one may also need to perform other analyses such as detailed reviews of news and analyst reports, financial analyses, and valuation analyses in order to isolate the portion of the investment loss and inflation per share attributable to loss causation. It is generally accepted in both the academic

literature and by economists in general that these other analyses can be performed in order to isolate the relevant portion of certain events and determine loss causation. (Hakala Tr. 92:24-96:4.) In this case, I have summarized the results of such analysis in the Hakala Expert Report (pp. 22-28 at ¶¶29-40) and provided calculations consistent with the Cornell and Morgan article in Exhibit E to the Hakala Expert Report. As discussed above and in the Hakala Expert Report, I considered each of the alternative methods for analyzing the relevant events (financial analyses, deductive reasoning by ruling out alternatives, valuation analyses, and detailed reviews of analyst and news reports).

27.    Two of the indices considered in my event study analyses were composed of three companies (Swift Energy, Comstock Resources, and St. Mary Land and Exploration; tickers: SFY, CRK, and SM) and two of the companies (Newfield Exploration Company and The Houston Exploration Company; tickers: NFX and THX), respectively, identified as peer group companies with significant Gulf Coast oil and gas exploration activities that would be affected by the same market, industry and environmental forces as Stone Energy. Of these five companies, four were explicitly mentioned by Stone Energy as peers in Stone Energy's Definitive 14A (Proxy Statement) filed on March 31, 2005 (p. 16) and the fifth company, Comstock Resources, was mentioned in connection with Stone Energy in other materials I reviewed. Additionally, in the Hakala Expert Report (p. 15 at footnote 12), I also considered the company EPL in preliminary event analyses, but removed it from the indices due to its relative lack of statistical significance. As shown in the attached chart to this declaration in Exhibit I, the relative decline in Stone Energy's share price on October 6 and 7, 2005, and between October 6, 2005 and March 14, 2006, cannot be explained by common industry forces reflected by the average movements in the stock prices of EPL, SFY, CRK, SM, NFX

and THX (adjusted for dividends), including the subject hurricanes.  Despite rising oil and gas prices, the negative effects of Hurricanes Katrina and Rita can be seen in average price declines and temporary Stone Energy stock price declines on specific dates from August 29 to October 3, 2005.  As shown in Exhibit I to this declaration, Stone Energy's relative share price fell significantly more than its peers on October 6 and 7, 2005 and ended with a relative share price 20% less than its peers by March 14, 2006.  If Hurricanes Katrina and Rita explained the decline in Stone Energy's share price, then similar relative sustained share price declines should have been be observed for other peer companies that reportedly suffered as great or greater relative damages to production and reserves than Stone Energy as a result of those two hurricanes.  The conclusion that Stone Energy's share price was 20% lower than its peers by March 14, 2006 is also consistent with the magnitude of Stone Energy's reserve restatement as of December 31, 2004 and the analyses I performed in Exhibit E to the Hakala Expert Report.

### Support for Deposition Testimony Regarding Loss Causation Analyses

28.    The bases for my opinions regarding loss causation were further discussed at length in my deposition. (Hakala Tr. 94:12-22-95:4.) Using relative reserve revisions and changes in the valuation of reserves is an appropriate method for valuing oil and gas exploration and production companies; Id. at 96:6-11, 100:2-8 considered the statements and analyses in analyst reports; Id. at 96:12-24 prior information and disclosures regarding the damage caused by Hurricanes Katrina and Rita had already been factored into Stone Energy's share price and, thus, much of the reduction in production and reserves associated with hurricane damage could not have caused the relative decline in Stone Energy's share price on October 6 and 7, 2005 or thereafter; Id at 99:11-21, 115:2-21 hurricane damages are largely

temporary and permanent damage is reflected in the relative small portion of the reserve revisions attributable to hurricane damage, temporary reductions in production due to hurricane damage are recoverable and have significantly less stock price impact; and Id. at116:12-117:13 considered the effects of Hurricanes Katrina and Rita on other oil and gas companies in analysis and found some further impacts in and after October 2005, but not enough to explain more than a "fraction" of the relative loss in Stone Energy's share price).

29.    Defendants' Daubert Memorandum incorrectly asserts in this respect that I provided an (p. 9) "impromptu quantification to this statement, testifying that 90% of the decline following a key company announcement was attributable to the alleged fraud. (Hakala Tr. 143:19-144:19.) But his basis for reaching this conclusion is not scientifically sound." However, the statement regarding the percentage effect corresponds with the analyses set forth in Hakala Expert Report (pp. 22-28 at ¶¶29-40) and Exhibit E and is consistent with the relative reserve and valuation impacts discussed in Hakala Expert Report (¶33). Additionally, this assertion omits my deposition testimony as to the multiple bases for this opinion, as discussed in the immediately prior paragraphs in the Hakala Tr. (94:12-117:12.) To the extent the event study ruled out the impact of the Hurricanes Katrina and Rita, as shown in the attached chart in Exhibit I, the hurricane damages cannot more than a portion of the relative decline in Stone Energy's share price on October 6 and 7, 2005 and between October 6, 2005 and March 14, 2006.

30.    Defendants' Daubert Memorandum also asserts (p. 10) "Hakala provides no academic authority,…, demonstrating that a cursory review of analyst reports (which do not opine on the cause of the stock price declines) and another expert report (which does not purport to address the causes for stock price declines) is an acceptable way to determine the relative

causes of a stock price decline." Cornell and Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review*, June 1990, pp. 894-897, is an example of an "academic discussion" on the subject supporting the analyses and bases set out in the Hakala Expert Report (¶¶29-40) and in my deposition testimony. (Hakala Tr. 94:12-117:12.)

31.     Exhibit F to the Hakala Expert Report provides excerpts from various analyst reports supporting my loss causation conclusions, as noted in my deposition. (Hakala Tr. 175:3-6, 176:22-25, 177:25-178:25.) Given the discussion in the Hakala Expert Report (¶33) and the analyst report excerpts provided in Exhibit F to the Hakala Expert Report, the analyses performed went well beyond "a cursory review of analyst reports." The assertion that the analyst reports cited in the Hakala Expert Report did not attribute the decline in Stone Energy's share price to the reserve revision is contradicted by the Key Banc report dated October 6, 2005 ("This reserve revision will likely be seen as negative and thus we expect significant near-term negative impact in the shares today."), the RBC Capital Markets report dated October 7, 2005 ("SGY is likely to trade at a discount to NAV based on the negative reserve revisions, lack of strong drilling results in the core Gulf of Mexico area, and lack of near-term catalysts. Our price target of $46 is 15% below our one-year forward NAV estimate."), and the Key Banc report dated December 5, 2005 ("STOCK HAS SUFFERED MORE ON PULLBACKS THAN REST OF GROUP •SGY lost about $8 per share (falling to $48.17 from $56.07), in the wake of the writedown announcement on October 6, 2005. Since then, the stock has tended to take a bigger hit than the rest of the group during sector pullbacks, and not respond as well on rebounds.").

32.    Furthermore, as provided in Exhibit G to this declaration, a number of media reports in my document production specifically attributed the decline in Stone Energy's share price to the reserve revisions and each analyst cited in Exhibit F to the Hakala Expert Report specifically reduced the price target for Stone Energy significantly as a result of the reserve revisions at issue in this case. This was discussed in the Hakala Expert Report (¶33) and deposition (Hakala Tr. 99:13-21, 111:12-18.) and shown in the analyst reports cited in Exhibit F to the Hakala Expert Report (For example, the RBC analyst report dated February 8, 2006, stated, "We lowered our price target from $49/share to $44/share based on our estimated Net Asset Value which declined due to the lower reserves at YE05."). The net asset value of Stone Energy's reserves is directly related to its stock price and such <u>a large and unexpected change in reserves would necessarily have led to a large price decline in Stone Energy's share price</u>.

**_Implementation of the Analyses was Sound and Produced Correct Conclusions_**

33.    The criticisms of the implementation of the methods in the Hakala Expert Report alleged in Defendants' Daubert Memorandum were erroneous or immaterial and did not alter the conclusions of the analyses.

34.    Defendants' Daubert Memorandum (p. 11) misstated my opinion as being that the "market had accounting for the full extent of the hurricane production decline by the end of September [2005]." In truth, my opinion was that that the decline in Stone Energy's relative share price on October 6 and 7, 2005 was "primarily, if not exclusively, to the announced revision of proved reserves." However, I explicitly acknowledged that additional information regarding hurricane damage possibly had some effect on Stone Energy's share price after September 2005, but the effect was small relative to effect of the reserve revisions

on Stone Energy's relative share price.  (Hakala Expert Report ¶6; Hakala Tr. 110:20-111:18.)

35.     Defendants Memorandum (p. 12) also makes an issue with respect to the timing of a Moody's credit report published on February 21, 2006.  We clearly had a source that dated the report as having been published before 4 p.m. but further investigation suggests the report became available after 4 p.m. E.S.T. and after the close of trading on February 21, 2006.  The Moody's credit rating report on Stone Energy was attributed to the correct calendar date in the original event study but the exact timing of the report was not correct.  Moving the publication of the Moody's credit report to after the close of trading on February 21, 2006 did not alter the conclusions.  Stone Energy's share price fell 4.6% in relative terms on February 21, 2006 (Hakala Expert Report, Exhibits D-1 and D-2), and the statistical significance of this relative stock price decline (t-statistic of 4.30, confidence level of 99.999%) is such that there is no reasonable doubt that material news and information came into the market during trading on February 21, 2006.  (Hakala Expert Report, Exhibit D-1.)  According to *Platt's Oilgram*, February 22, 2006, p. 3, "Shares of the Lafayette, Louisiana-based E&P fell 2.8% as Stone announced receipt of notice of non-compliance from bondholders for failure to revise four years of financials while it investigates the reserve declines first revealed in October (ON 12/15/05)."; "The turmoil of the reserve revisions have played havoc with Stone's stock price, which hit a 52-week high of $62.50/share just before the October warning and  finished Feb 21 at $42.95."  Thus, the decline in Stone Energy's share price on February 21, 2006 was still attributable to investor concerns regarding the effect of the reserve revisions on Stone Energy's credit-worthiness and relations with its lenders.   (Hakala Expert Report pp. 25-26 at ¶37 and footnote 33.)

36.     Similarly, considering the Hibernia Southcoast Capital analyst report issued on October 6, 2005 (that had not been identified in my search for news and analyst reports due to lack of availability at the time of our search) actually supports my conclusions.  The report is titled, "SGY Announces Negative Reserve Revisions; Lowering Estimates and Price Target," and stated "SGY revised down 20% of year-end reserves."  This report is, thus, consistent with the other analyst reports in that the primary cause of the reduced price target and valuation of Stone Energy's common shares was based on the downward reserve revision and not the consequences of Hurricanes Rita and Katrina.

37.     Finally, the Hakala Expert Report explicitly considered the appropriate peer-group companies (identified by their ticker symbols in Exhibits D-1 and D-2 to the Hakala Expert Report) and industry common stock and commodity price indices that were consistently available throughout the event study period and did consider those peer group companies that proved to be significant in explaining Stone Energy's stock price movements in the event study analysis. (Hakala Expert Report on pp. 14-16 at ¶21 and footnote 12.)  As noted in footnote 7 of Defendants' Daubert Memorandum (p. 13), the name, but not the ticker symbol, of one peer company used in an industry index in the event study analysis was incorrectly identified once in the narrative text of the original Hakala Expert Report due to a transcription error during the editorial review process.  This was corrected on June 20, 2008 (Hakala Expert Report p. 15 at ¶22).  The Houston Exploration Company (ticker: THX) and not "Thundelarra," was the peer company included in the event analyses in Exhibits D-1 and D-2 of the Hakala Expert Report and was an appropriate peer company, according to Stone Energy's March 31, 2005 Proxy Statement (p. 16).  Thus, the criticism as to the name of one of the peer companies has no effect on the analysis in the Hakala Expert Report.

### *Defendant's References to Court Rulings in Other Matters are Inaccurate, Incomplete, and Inconsistent with Other Prior Court Rulings*

38.    As set forth in Exhibit J to this declaration, the vast majority of decisions of record relating to my testimony (when not rendered moot) have been favorable to that testimony in that courts have rejected motions to strike my expert opinions, rejected or refused to acknowledge criticisms of my expert opinions, and relied more on my expert testimony over the testimony of opposing witnesses and experts in reaching certain dispositive findings. With respect to the cited cases in Defendants' Daubert Memorandum (pp. 1-3, and 11), Defendants' Daubert Memorandum is inaccurate and incomplete in several respects:  (i) certain of the courts in the cited cases ruled on legal issues (not *Daubert* issues) and/or rejected motions to strike my testimony;[27] (ii) certain of the courts in the cited cases adopted or relied primarily on my expert analyses and testimony in reaching the ultimate conclusions,[28] my testimony was validated subsequently,[29] and/or certain of the cited cases

---

[27] For example, the court in *In re Metris* rejected the *Daubert* motions entirely on November 8, 2005 (Transcript of Proceedings, p. 44:1-1 "The *Daubert* motions are denied."), but granted summary judgment on scienter grounds in January 2006 and the case was then settled after being granted a hearing on appeal in the 8th Circuit; the court in *In re Omnicom* rejected the *Daubert* motion entirely on August 24, 2007 (Transcript Regarding Hakala Daubert Motion, p. 32:19-20, "For the foregoing reasons, the defendant's motion to exclude the proposed expert testimony of Dr. Hakala is denied."), but later granted summary judgment in January 2008 and that decision is currently on appeal in the 2nd Circuit; the court in *Bell v. Fore Systems* indicated orally that it rejected the *Daubert* motions but then issued a legal/statutory interpretation that aggregate damages should not be decided by a jury, and ultimately accepted a settlement and plan of allocation based, in part, on my analyses; and the court in *In re Broadcom* noted in an unpublished opinion that Hakala was admittedly "qualified" with respect to event studies and loss causation, relied on Hakala's testimony in granting class certification over the opposition of defendants and their expert, and cited Hakala's opinion favorably in a final ruling approving the settlement and plan of allocation, 2005 U.S. Dist. LEXIS 41976 (C.D. Cal., Sept. 12, 2005).

[28] For example, the court in *Avis Industrial Corp. v. Commissioner*-conclusion as to reasonable compensation ($1.15 million) followed the logical and numerical opinion in the Hakala Expert Report ($1.05 million) with a modest upward modification and rejected the opposing expert's opinion (reasonable compensation in excess of $3.8 million); the court in *Brewer Quality Homes v. Commissioner* adopted the reasonable compensation numbers Hakala testified to at trial as amended to address new factual information and rejected the two opposing experts' opinions that the compensation was reasonable, and the court's decision was affirmed on appeal in the 5th Circuit; the court in *In re Broadcom* relied on Hakala's expert testimony over opposition testimony on issues of class certification and loss causation in two key decisions, including the final decision approving the settlement and plan of allocation in 2005 U.S. Dist. LEXIS 41976 (C.D. Cal., Sept. 12, 2005); the 5th Circuit in *Greenberg v. Crossroads Systems* partially overturned the District Court opinion denying class certification on loss causation and reliance grounds with respect to certain claims consistent with the Hakala Expert Report in that case.

[29] For example, with respect to the decision in *Kohler v. Commissioner*, see the peer-reviewed article,  "The

were settled in a manner inconsistent with Defendants' representations;[30] (iii) certain of the cited cases were or are subject to appellate review;[31] and (iv) Defendants omit numerous decisions in other cases by those same cited courts[32] and other similar courts[33] which rejected such motions to strike my testimony, relied on my analyses and/or otherwise rejected criticisms of my analyses.[34]   Examples of more recent *Daubert* and/or class certification

---

Other Side of Kohler: IRS Expert Offers Insights," *Business Valuation Update*, January 2007, and more recent articles, "IRS Rejects Kohler," *BVWire*, Vol. 66-2, March 12, 1998 and "IRS Proposes Ruling Out Kohler," *BVWire*, Issue 67-5, April 30, 1998.

[30] Note, for example, *Roth v. Mims* settled while on appeal to the 5th Circuit; *In re Metris* settled while on appeal to the 8th Circuit; the *In re Broadcom Securities Litigation* settlement and plan of allocation was approved by the court,, based in part on my expert testimony, over objections in 2005 U.S. Dist. LEXIS 41976 (C.D. Cal., September 12, 2005); *Greenberg v. Crossroad Systems* settled subsequent to the cited decision in a manner inconsistent with Defendants' representation in Defendants' Memorandum p. 11.

[31] The decisions in *In re Metris Sec. Lit.* in the 8th Circuit for summary judgment on scientor, *Roth v. Mims* (aka *In re Performance Nutrition Inc*.) in the 5th Circuit for factual and legal grounds; *In re Omnicom Sec. Lit.* is currently in briefing on appeal in the 2nd Circuit on summary judgment relating to loss causation; and the recent decision in *Fener v. Belo Corp*. was granted interlocutory appeal by the 5th Circuit in June 2008.

[32] While aspects of my testimony were not relied upon in one case, the same court (same judge) relied primarily on my expert opinions in other cases.  Examples include:  *In Thermex Energy Corporation, Debtor* (Case No. 390-37987-HCA); United States Bankruptcy Court, Northern District of Texas, Dallas Division, Honorable Judge Harold C. Abramson presiding; testimony in hearing held November 3, 1995, where court accepted testimony to approve settlement and the same court was involved in *Roth v. Mims (aka In re Performance Nutrition Inc.)* cited by Defendants; The Honorable Judge Colvin adopted my opinions as "helpful" in *Normandie Metal Fabricators v. C.I.R.*, T.C. Memo 2000-102 and rejected the use of prior adverse court opinions to impugn my credibility in contrast with his opinion in *Barnes v. C.I.R.* cited by Defendants; and in *In re Xcelera.com* consider the opinions in *In re Xcelera.com Securities Litigation*, 430 F.3d 503-518, (1st Cir., Dec. 13, 2005) and *In re Xcelera.com Sec. Litigation,* 2004 U.S. Dist. LEXIS 29064 (D. Mass., Sept. 30, 2004).

[33] For example, while Defendants' Memorandum cites to a couple of adverse rulings in cases involving the Internal Revenue Service, there are numerous cases involving the Internal Revenue Service where my testimony was given the most weight and was adopted at least in part over the testimony of opposing experts, such as: *H Group Holding Inc.  v. CIR*, T.C. Memo 1999-334; *Exacto Spring v. CIR*, T.C. Memo 1998-220; *Normandie Metal Fabricators v. C.I.R.*, T.C. Memo 2000-102 (affirmed 2nd Circuit)*; Norwest Corporation v. C.I.R.*, 108 T.C. 265 (1997); *Universal Marketing Inc. v. C.I.R.*, T.C. Memo 2007-305; *Vitamin Village Inc. v. C.I.R.*, T.C. Memo 2007-272; *Wechsler & Co. Inc.. v. C.I.R.*, T.C. Memo 2006-173; *Menard Inc. v. C.I.R.*, T.C. Memo 2004-207; and *Avis Industrial Corporation Inc. v. C.I.R.*, T.C. Memo 2004-207.  Additionally, there are a number of instances in US Tax Court where, despite opposing testimony, at the court's urging the parties entered into stipulations of fact that reflected my testimony, such as *J. C. Shepherd v. C.I.R.*, 115 T.C. 30 (2000) and *Autoland of New Jersey, Inc., et al.; v. Commissioner of Internal Revenue*; U.S. Tax Court Docket number 12639-02, testimony at trial February 19, 2004.  Thus, just in U.S. Internal Revenue Service matter, my testimony was found to be credible, helpful, or otherwise was the primary basis for the court's opinion or the stipulated outcome in a substantially greater number of cases.

[34] See, for example, *In re JDS Uniphase Securities Litigation*, Transcript of Proceeding, November 1, 2007, p. 1118, "3 "THE COURT: WELL, WE'RE NOT GOING TO HAVE QUOTES FROM 4 JUDGES SAYING THINGS ABOUT HIS OPINIONS.   IF HE WAS NOT 5 QUALIFIED -- IF HE WAS FOUND UNQUALIFIED AS AN EXPERT IN A GIVEN 6 CASE, I SUPPOSE YOU CAN BRING THAT OUT.   BUT WE AREN'T GOING TO 7 BE BANDYING ABOUT DICTA FROM OTHER COURTS' VIEWS OF HIS 8 TESTIMONY IN SOME OTHER CASE THAT WE DON'T KNOW REALLY WAS THE 9   SAME AS THIS TESTIMONY OR NOT."; *In re Xcelera.com Sec. Litigation,* 2004 U.S. Dist. LEXIS 29064 (D. Mass.,

rulings applicable to the methods and opinions in the Hakala Expert Report in this case include: *In re Flag Telecom Sec. Lit.,* 2007 U.S. Dist. LEXIS 67173, (S.D.NY. Sept. 4, 2007); *Wagner v. Barrick Gold*, 2008 U.S. Dist. LEXIS 15811, (S.D.NY. Feb. 15, 2007); *In re Clarent Securities Litigation* (Daubert motion denied with respect to event study analysis, loss causation and per share damages January 31, 2005 in a hearing before the court and testimony at trial February 9, 2005) and *In re JDS Uniphase Securities Litigation* (motions to strike relating to event study methodology, loss causation testimony, per share damages and other matters denied in minute order dated October 9, 2007, and other motions to strike denied leading to testimony at trial November 1, 2, and 16, 2007). A partial list of cases with favorable decisions and rulings with respect to my expert testimony is provided in Exhibit J to this declaration.

## IV.    COMMENTS ON THE FISCHEL REPORT

### *Demonstration of Inflation per Share During the Class Period*

39.    The conclusions in paragraphs 11 to 13 (pp. 5-7) of the Fischel Report are based on two serious conceptual flaws. First, as discussed in Hakala Expert Report (¶28) inflation can occur without a statistically significant price increase. This concept is well-recognized by economic experts.[35] If a false and/or misleading statement prevents a stock price from

---

Sept. 30, 2004) ("n5 Although defendants attack Hakala's credentials and expertise, such arguments largely amount to a red herring. His training and experience amply qualify him to testify about the efficiency of the market in which Xcelera shares were traded."); *Patricia E. Vincent and James R. Vincent v. Bank of America Texas, N.A.*; In the 68th Judicial District Court, Dallas County, Texas (Cause No. DV99-00745); testimony in hearing in December 2000 and trial testimony December 18, 2001, ruling during trial testimony; *George J. Cortes, Individually and Derivatively on Behalf of MCS/Texas Direct, Inc., v. John W. Windle, Jr., MCS/Texas Direct, Inc. and Alon R. Stephens, v. George J. Cortes, Individually* (Cause No. 352-168681-97), District Court of Tarrant County, Texas, 352nd Judicial District; deposition testimony February 4, 1999; testimony in hearing on September 10, 1999, and at trial on September 28 and 29, 1999, ruling in bench trial; and *Normandie Metal Fabricators v. C.I.R.*, T.C. Memo 2000-102 (characterizing Hakala testimony as "helpful" and rejecting and refusing to consider at trial and in the opinion adverse court opinions from other cases).
[35] Cornell and Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review*, June 1990, pp. 907-909; See, for example, *Nathenson v. Zonagen*  267 F.3d 400; 2001 U.S. App.

declining to its true value, then inflation has occurred, even if there were no statistically significant increases in Stone Energy's share price associated with false and/or misleading statements. Second, this discussion in the Fischel Report ignores the close connection between the fair value of Stone Energy's proved reserves and its share price, as set forth in the Hakala Expert Report (¶31-33 and Exhibits E and F), and further discussed in deposition (Hakala Tr. 74:1-10, 111:4-115:15). An examination of the analyst reports in Exhibit F and the reserve analysis in Exhibit E to the Hakala Expert Report establishes affirmatively that the overstatement of Stone Energy's proved reserves caused significant inflation in Stone Energy's share price prior to October 6, 2005 and the disclosure of the reserve revisions resulted in loss causation on October 6, 2005 and between October 6, 2005 and March 14, 2006.

40.    As noted in the Fischel Report (pp. 5-6), and as I testified (Hakala Tr. 102:16-23), Stone Energy's share price did underperform relative to its peers during the Class Period. The primary cause of this underperformance was due to Stone Energy's relatively poor performance in creating new proved reserves to replace the effect of production drawing

---

LEXIS 20902 U.S. Fifth Circuit, Sept. 25, 2001 ("We also realize that in certain special circumstances public statements falsely stating information which is important to the value of a company's stock traded on an efficient market may affect the price of the stock even though the stock's market price does not soon thereafter change. For example, if the market believes the company will earn $ 1.00 per share and this belief is reflected in the share price, then the share price may well not change when the company reports that it has indeed earned $1.00 a share even though the report is false in that the company has actually lost money (presumably when that loss is disclosed the share price will fall") See, also, *Phillips v. Scientific-Atlanta, Inc.,* 2007 U.S. Dist. LEXIS 66282 (N.D. Ga., Sept. 7, 2007), "Contrary to Defendants' argument, [HN28] the mere absence of a statistically significant increase in the share price in response to fraudulent information does not "sever the link" between the material misstatements and the price of the stock. Rather, price stability may just as likely demonstrate the market consequence of fraud where the alleged fraudulent statement conveys that the company has met market expectations, when in fact it has not.... Thus, [HN29] even in the absence of demonstrated increase in share price resulting from fraudulent statements, a plaintiff may recover under a fraud on the market theory if that plaintiff can show that negative truthful information which causes a decrease in share price is related to an allegedly false positive statement made earlier, and that it is more probable than not that it was this negative statement, and not some other factor, that caused a significant amount of the decline. *Greenberg, 364 F.3d at 666.*"

down existing reserves, and the inability to increase production to match the reported reserve levels.[36]  In part, this is not independent of the inflation of proved reserves.  To the extent proved reserves are significantly inflated, then subsequent production levels will ultimately be much lower than expected and the costs associated with exploration and development necessary to increase or replace proved reserves and generate production will be greater than expected.  Thus, part of the poor relative performance of Stone Energy's share price was associated with its relative inefficiencies.[37]  In this context, the assertion (Fischel Report p. 7 at ¶13) that "if Stone's stock price was artificially inflated during the Class Period as claimed, one would expect that the Company's stock price would have outperformed these four indices prior to the first corrective disclosure on October 6, 2005" is conceptually and provably wrong and inconsistent with the facts in this case.  There is no necessary or logical connection between the relative performance of the share price prior to the corrective disclosures and the inflation in the share price during the Class Period.

### Corrective Disclosures Caused Significant Stock Price Declines

41.     Contrary to the implication in the Fischel Report (pp. 7-8 at footnote 6), there are a number of accepted methods for estimating market models in event study analyses.  The use of "dummy variables" or, more properly, "intervention analysis" is a widely accepted and recommended methodology in the field of time-series statistics,[38] including in numerous

---

[36]   See, for example, a KeyBanc analyst report dated December 14, 2004 initiating coverage of Stone Energy with a "Hold" rating.  This report stated, (p.1) "Production declined in 2003, and when 2004 is complete we expect SGY to show a second year of declining production. With the resignation of Peter Canty, former Chief Executive Officer, in April 2004, SGY is under new leadership by a BP veteran with a new vision of diversification for the Company. We believe this could prove to be a positive change for SGY, but note the inertia of steep GOM [Gulf of Mexico] declines the Company is up against."; and (p. 5), "SGY's reserve growth has slowed and production has declined."; "SGY's finding cost structure has been high."; and "Steep declines in the GOM, and the fact that 94% of SGY's production is sourced in Gulf basins mean that SGY is particularly challenged in replacing production and growing reserves."
[37]   Ibid. See for example, a Key Banc analyst report dated Dec. 14, 2004 "Initiating Coverage", p. 5
[38]   For example, Franses, *Time Series Models for Business and Economic Forecasting,* 1998; Box, Jenkins, and

peer-reviewed academic references in the event study, finance and time-series statistics literature on the use of this methodology as set forth in the Hakala Expert Report (pp. 16-17 at footnotes 13-14). Numerous sources recommend the methodology I employed or some equivalent methodology in preference to the more simplistic methods in the papers cited by Mr. Fischel.[39] Moreover, Mr. Fischel has not even attempted to test my methods using generally accepted tests as are discussed in the Hakala Expert Report.

*October 6 and 7, 2005*

42.     The failure to submit an event study, failure to systematically review news and analyst reports, and failure to conduct any financial or valuation analysis renders the discussion in the Fischel Report (pp. 8-13 at ¶¶15-20) insufficient to support the conclusions asserted. The examination of absolute share price movements without controlling for industry and market forces causes a number of his statements to be unreliable. For example, there was a statistically significant decline in Stone Energy's relative share price on October 7, 2005 of approximately 2.7%. (Hakala Expert Report, Exhibits D-1 and D-2.) However, ¶15 and footnote 7 of the Fischel Report states that Stone Energy's share price declined only 0.4% on October 7, 2005. While technically true, the changes in oil and gas price

---

Reinsel, *Time Series Analysis: Forecasting and Control*, Third Edition, 1994, (also, forthcoming Fourth Edition, July 2008); Pena, Tiao, and Tsay, *A Course in Time Series Analysis*, 2000; Montgomery, Jennings and Kulahci, *Introduction to Time Series Analysis and Forecasting*, 2008; Yaffe, *An Introduction to Time Series Analysis and Forecasting: with Applications of SAS and SPSS*, 2000; and Brockwell and Davis, *Introduction to Time Series and Forecasting*, 2003 all contain sections that focus on intervention analysis and McDowall, McCleary, Meidinger, Hay, *Interrupted Time Series Analysis*, 1980, focus on intervention analysis.

[39] Larcker, Gordon and Pinches, "Testing for Market Efficiency: A Comparison of the Cumulative Average Residual Methodology and Intervention Analysis," *Journal of Financial and Quantitative Analysis*, June 1980, pp. 267-287; Franses, *Time Series Models for Business and Economic Forecasting*, 1998, Chapter 6; Marais and Schipper, "Chapter 17A: Event Study Methods: Detecting and Measuring the Security Price Effects of Disclosures and Interventions," *Litigation Services Handbook: The Role of the Financial Expert*, Third Edition, 2005 Cumulative Supplement, Chapter 17A, pp. 18, and 22-23; Kennedy, *A Guide to Econometrics*, Fifth Edition, 2003; Aktas, de Bodt and Cousin, "Event Studies with a Contaminated Estimation Period," *Journal of Corporate Finance*, Vol. 13, 2007, pp. 129-145.

expectations meant that Stone Energy's share price should have increased on October 7, 2005, instead of declining.

43.     Mr. Fischel fails to consider that disclosures and news in late August and September 2005 meant that a significant portion of the damages associated with Hurricanes Katrina and Rita had already been reflected in Stone Energy's share price prior to October 6, 2005. (Fischel Report Exhibit P) entitled, "Production Estimates Reduced Due to Hurricane Rita Impact."  It is not denied in the Hakala Expert Report or in the Hakala Transcript (111:4-18) that some relatively modest portion of the decline in Stone Energy's relative share price on October 6, 2007 might be attributable to the additional information disclosed regarding the hurricane damages to reserves and production.  Rather, the point is that a substantial portion of the damage from the hurricanes was already reflected in Stone Energy's share price prior to October 6, 2005, and the incremental disclosure of additional damages and delays in ramping back up production on October 6, 2005 could, therefore, not have possibly been the sole or primary cause of the decline in Stone Energy's share price on October 6 and 7, 2005.

44.     The failure of Mr. Fischel to perform event studies on the two other Gulf Coast exploration and development companies mentioned in the Fischel Report means that the anecdotal discussion (Fischel Report pp. 11-12 at ¶18) regarding the stock price effects of hurricanes is incomplete, unreliable and misleading.  In order to perform a reliable analysis, one would have to consider all of the disclosures by all of the companies that suffered damages from hurricanes and consider their overall stock price movements over time from before the hurricane to after the damages assessments had been disclosed.  Additionally, one would have to consider the relative amount of permanent damage to the reserves each company realized and any other negative news disclosed in these announcements.

45.    Mr. Fischel (¶17) asserts that "The Houston Exploration Company's stock price declined 8.3 percent" as a result of delays in production caused by hurricanes. However, The Houston Exploration Company's announcement late on October 17, 2005 stated, "Compounding the hurricane production delays, the company's 2005 production results will be further negatively impacted by approximately 6 Bcfe to 7 Bcfe due to performance issues at various fields. Three offshore wells completed during the third quarter 2005 account for more than 50 percent of the impacted production. Two of the wells are producing at restricted rates, one due to a lack of pipeline capacity and the other due to a mechanical problem, and at High Island 115 the company participated in a development well that was dry." Thus, a substantial portion of the decline in production announced was associated with performance issues separate and apart from the announced hurricane damage. Additionally, the thirteen peer companies (CRK, EPL, THX, WTI, COG, FST, TMR, NFX, NBL, PPP, SM, SFY, and XTO) analyzed realized an average stock price decline of 5.0% on October 18, 2005. Thus, netting out industry effects, the net decline in Houston Exploration Company's share price on October 18, 2005 was only 3.6%, and much of that decline was due to other production issues disclosed by the company on that day. By comparison, Stone Energy's relative share price declines were 11.0% on October 6, 2005 and 2.48% on October 7, 2005. Thus, the October 18, 2005 Houston Exploration Company event supports my conclusion that the primary cause of the decline in Stone Energy's share price on October 6 and 7, 2005 could not be caused by incremental information regarding hurricane damage.

46.    Similarly, Mr. Fischel asserts that hurricane damage led to a 7.5% decline in W&T Offshore's share price on October 3, 2005, but did not compare that disclosure with the various disclosures by Stone Energy regarding hurricane damage from August 29 to October

6, 2005. W&T Offshore initially indicated that the first hurricane did little damage (*Associated Press Financial Wire*, September 3, 2005) and then clarified that it still expected production to exceed the prior year in an analyst conference on September 12, 2005 (*PR Newswire*). The second hurricane, Rita, however, caused considerably more damage (and more permanent damage to W&T Offshore). When W&T Offshore disclosed the amount of damage from the hurricanes, it proved to be far worse than the damage suffered by Stone Energy.[40] According to W&T Offshore's press release on October 3, 2005, all of W&T Offshore's production was temporarily "shut-in" after the two hurricanes and production was less than 10% of pre-hurricane levels as of October 3, 2005. Additionally, severely damaged platforms represented more than 5% of production. Given W&T Offshore's greater and more unexpected damage announced on October 3, 2005 (as compared with the hurricane damage realized by Stone Energy), the share price decline realized by W&T Offshore was substantially greater than for Stone Energy. By contrast, Stone Energy had revealed information about the damages it had suffered and its production levels in early September and late September 2005 such that much of the negative stock price effect associated with hurricane damage had already been reflected in Stone Energy's share price prior to October 6, 2005. Given this, an analysis of the information revealed over time and the relative amount of damage, W&T Offshore's disclosure is consistent with the conclusion that the disclosure of incremental hurricane damage cannot explain the magnitude of the decline in Stone Energy's share price on October 6 and 7, 2005, and that the primary cause of the

---

[40] According to Platt's Oilgram, October 4, 2005, "In addition, W&T Offshore said five of its operated platforms incurred "significant" physical damage. These include East Cameron 338 A and Eugene Island 397 A. Net daily production associated with the five platforms, of which the two mentioned comprise "nearly 100%," according to a W&T spokeswoman, is 15,000 Mcfe/d. The company is currently producing 24,000 Mcfe/d but still has 166,000 Mcfe/d shut-in from Rita and 55,000 Mcfe/d from Katrina, compared to 245,000 Mcfe/d pre-storms. An additional 17,000 Mcfe/d curtailed from Rita should come back in the next seven days, W&T said."

decline of was attributable to the announced revisions in reserves, consistently with the financial and valuation analyses in Exhibit E of the Hakala Expert Report.

47.     The discussion in the Fischel Report (p. 13 at ¶19) regarding February 8, 2006 is incomplete and ignores the evidence cited.   In fact, Stone Energy had been disclosing production information publicly such that it was known that production and reserves were not recovering as expected.   The tangible evidence of this is in a Platt Oilgram report on January 11, 2006 which led to an estimated 2.05% relative decline in Stone Energy's share price prior to February 8, 2006.   (Hakala Expert Report, Exhibits D-1 and D-2.)   Thus, the Fischel Report errs in asserting that the Hakala Expert Report "provides no evidence in support of this claim."   Additionally, the Fischel Report ignores the relative declines in Stone Energy's share price of 1.6% on February 9 and 2.0% of February 13, 2006 associated with analyst downgrades based significantly on the lower reserve estimates announced.

48.     For the same reason, the discussion in the Fischel Report (p. 12 at ¶19) regarding February 22, 2005 is incomplete.   The reserve reductions disclosed on February 22, 2005 were largely anticipated from information disclosed previously by Stone Energy.   In its November 4, 2004, press release and conference call, Stone Energy declined to give production guidance for 2005 indicating uncertainty and "limited visibility" as to future production from its reserve base (indicating possible impairment of reserves).   Additionally, Stone Energy was posting monthly production information (which would allow analysts and investors to assess decline rates in production from proved reserves and anticipate reductions in reserves).[41]   Consistent with this, analyst reports issued in November and December 2004 noted the failure of Stone Energy to produce at levels consistent with its reserves and noted that a number of high production wells were experiencing declines in production faster than

---

[41] KeyBanc Capital Markets Report, December 14, 2004, pp. 6 and 9.

expected.[42]  Stone Energy also acknowledged in a conference call on March 2, 2005, that the reserve revisions related to production issues and developments in the field that were disclosed in the second half of 2004  ("You will recall, you followed the production issues with this area early last year and this performance has now worked its way through the reserve system. In addition, we had a couple of unsuccessful proved undeveloped conversions, 1 at South Marsh Island 234 and one at Ewing Bank 305 which also contributed.").  Additionally, the reserve shortfall was partly attributable to delays in drilling associated with Hurricane Ivan and adverse weather between September and December 2004. Thus, the reserve revision was previously anticipated based on lower production guidance in late 2004.

*February 21, 2006*

49.    There is no dispute that Stone Energy's share price fell an extremely significant 4.6% in relative terms on February 21, 2006.  (Hakala Expert Report, Exhibit D-1 and D-2.)  A significant portion (0.9%) of that relative decline occurred between the close of trading on February 17 and the opening of trading on February 21, 2006.  According to *Platt's Oilgram*, February 22, 2006, p. 3, "Shares of the Lafayette, Louisiana-based E&P fell 2.8% as Stone announced receipt of notice of non-compliance from bondholders for failure to revise four years of financials while it investigates the reserve declines first revealed in October (ON 12/15/05).";  "The turmoil of the reserve revisions have played havoc with Stone's stock price, which hit a 52-week high of $62.50/share just before the October warning and finished

---

[42] KeyBanc Capital Markets Report, December 14, 2004, p. 5, and 9-10; RBC Capital Markets Report, November 4, 2004, p. 1, "The company has been unable to grow production over the past two years due to pipeline capacity constraints, quicker than expected declines of high rate wells, drilling delays and ,most recently, Hurricane Ivan."; Bear Stearns Report, November 4, 2004, p. 2 "Hurricanes, slippery (steep) decline rates and rising costs have become commonplace in the Gulf of Mexico shelf region, and Stone's recent experience has been no exception."

Feb 21 at $42.95." This news article directly links the issue of the reserve revision to the non-compliance issue and the decline in Stone Energy's share price on February 21, 2006.

*March 10 and 13, 2006*

50.    The Fischel Report is in error (pp. 14-15 at ¶24) and states incorrectly (p. 15 at footnote 17), "that an event affected the stock price if its t-statistic was greater than one is not standard in the academic literature and he [Hakala] fails to cite any published papers the use this approach." The citations provided in the Hakala Expert Report (pp. 17-19 at footnotes 15-18) specifically reject the rigid/inflexible view of statistical significance suggested by Mr. Fischel. In fact, it is widely understood and taught that it is better, from a measurement perspective, in terms of reducing bias and increasing precision, to consider variables/events that have a t-statistic greater than one. The specific concept is explicitly stated in Kennedy, *A Guide to Econometrics*, Fifth Edition, 2003, p. 409 (("It would be wiser to adopt a much smaller critical t value, say 1.0. For F-tests the p value is an easier guide; rather than a critical value of 0.05, a critical value of, say, 0.3 would be more suitable.") and p. 413 "Testing for exclusion of independent variables should adopt a low critical t value (1.0 or less, for example, rather than the traditional 2.0) to minimize the influence of type II errors (i.e., to avoid omitting a relevant variable)"). In general, pre-testing of any kind should be conducted using a significance level much higher (say, 25%) than the traditional 5%."). Cassidy, *Using Econometrics,* 1981, pp. 252-253, similarly rejects the deletion from the analysis of individual events (dummy variables) that are not, by themselves, statistically significant but are jointly significant as part of a set of events.

51.    The Fischel Report (pp. 15-16 at ¶¶24-25) fails to consider the relevant and materially adverse information disclosed and then subject to analyst commentary on March

10 and 13, 2006. The announced revenue realized by Stone Energy in the fourth quarter of 2005 was \$135.6 million as compared with a First Call analysts' consensus estimate of \$130 million.[43] Thus, the actual production and earnings information for the fourth quarter of 2005 was better than expected and should have, all else being equal, had a modestly positive stock price effect. However, more information was revealed late on March 9 and March 10, 2006 regarding Stone Energy's reserves, including the extent to which the reserve revisions applied to prior periods. In its press release, Stone Energy stated, "Stone has completed restatements of its previously filed financial statements for each of the years ended December 31, 2001, 2002, 2003, and 2004, and quarterly financial information for the periods ended March 31, 2005 and June 30, 2005." Additionally, Stone Energy provided lower production guidance in 2006. As I noted in my deposition testimony (Hakala Tr. 113:7-22), reserve estimates are based on estimates of the amount of production a set of reserves can generate in the future. The value of reserves is also based on estimates of the future timing of production from those reserves. Thus, the revisions in the fair values of proved reserves and the amount of proved reserves will both directly impact the share price as a result of a lower rate of production of product in the future from those reserves and indicated lower rate of success in generating new proved reserves over time (further reducing future production). For this reason, Stone Energy was further subjected to a reduction in target price from \$44 to \$42 per share by RBC Capital late on March 10 and early on March 13, 2006.

52.     Mr. Fischel's comment (p. 16 at ¶25) that Stone Energy's share price was \$0.05 higher at the *opening* on March 13 relative to the close on March 10, 2006 is made without consideration of market and industry forces. In fact, Stone Energy's relative share price did not increase as much as the thirteen peers in Exhibit H such that Stone Energy's relative

---

[43] *Dow Jones Newswire*, March 9, 2006, at 19:15.

share price declined at the opening of trading on March 13, 2006 as compared with the close of trading on March 10, 2006.  Mr.  Fischel does not consider the fact the Stone Energy's peers experienced stock price  increases on March 13, 2006 on average of approximately 2.0% based on the thirteen peers considered in Exhibit H.  In relative terms, Stone Energy's shares fell 2.5%, a statistically significant amount, on March 13, 2006.

Executed this 22nd day of July  2008 at Dallas, Texas.  I declare under penalty of perjury that the foregoing is true and correct.

_____
Scott D. Hakala, Ph.D., CFA