# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAFAYETTE-OPELOUSAS DIVISION

IN RE:                                          CIVIL ACTION NO. 05-2088 (LEAD)
STONE ENERGY CORPORATION                                05-2109 (MEMBER)
                                                        05-2220 (MEMBER)

JUDGE MELANÇON

MAGISTRATE JUDGE METHVIN

*RULING ON MOTION TO COMPEL*
*(Rec. Doc. 130)*

Before the court is a motion to compel production filed by Lead Plaintiff El Paso Fireman

and Policeman's Pension Fund seeking an order compelling defendant Stone Energy Corporation to

respond to certain discovery requests.[1]  Stone Energy filed an opposition, and El Paso filed a reply.[2]

## Background

This consolidated class action, filed on December 6, 2005, alleges that Stone Energy

Company and four of its top executives schemed to overstate Stone's proved oil and gas reserves by

over 20% over a 4 ½ year period in violation of SEC rules.  Plaintiffs are persons and entities who

purchased or acquired shares of Stone stock between May 2, 2001 and March 10, 2006 (the "Class

Period").[3]  Plaintiffs allege violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934,

15 U.S.C. §78j(b) and 78r(a), and Rule 10b-5, 17 C.F.R. §240.10b-5.  In March, 2006, the court

appointed El Paso as the lead plaintiff.[4]

---

[1] Rec. Doc. 130.

[2] Rec. Docs. 151, 158.

[3] On September 29, 2007, the claims of plaintiffs who sold their shares before the October 6, 2005
disclosure were dismissed.  Rec. Doc. 117.

[4] Rec. Doc. 16.

### *The Discovery Dispute*

The discovery dispute revolves around the following undisputed facts: On October 6, 2005, Stone announced a significant downward revision to its estimates of proved hydrocarbon reserves. Stone also announced that its Board of Directors had authorized an internal investigation into the reserve statement, and its Audit Committee had hired the law firm of Davis, Polk & Wardwell to assist the Committee in its investigation into the reserve overstatement.[5] Davis Polk gave a preliminary report to Stone's audit committee on November 4, 2005, and its final report on November 28, 2005.[6] On December 5, 2005, Stone announced that the SEC staff was conducting an informal inquiry into the downward revision of estimated proved reserves and the financial restatement and that it would cooperate fully in the inquiry.[7] Davis Polk presented the conclusions of its investigation to the SEC Staff.

On December 4, 2007, El Paso propounded its first request for production of documents. Defendants responded but withheld from production materials created by Davis Polk at the direction of the audit committee and in connection with its internal investigation ("Davis Polk materials"). El Paso seeks to obtain the Davis Polk materials.[8] On February 1, 2008, defendants provided El

---

[5] Rec. Doc. 130, Exh. D at p. 31.

[6] Id.

[7] Rec. Doc. 151, Preston Decl. Exh. D.

[8] The specific requests at issue are:

Request No. 1: All documents provided to the SEC in connection with the SEC's inquiry into the revision of Stone's proved reserves and the financial statement restatement, as referenced in Stone's Form 10-Q for the period ended March 31, 2006.

Request No. 2: All documents provided to the Philadelphia Stock Exchange in connection with its investigation of "trading in Stone securities prior to Stone's October 6, 2005 announcement," as disclosed in Stone's Form 10-Q for the period ended March 31, 2006.

Paso with a privilege log, asserting attorney-client privilege and qualified work-product immunity.

On March 21 2008, Stone amended the privilege log abandoning the attorney-client privilege due to

waiver: Stone disclosed that it had previously produced the documents at issue to the SEC, Ernst &

Young, Energy Partners, and Plains Exploration & Production Co.

### Issues Presented

The following issues are presented:  (1) whether the motion to compel is premature; (2)

whether the materials sought are work-product; and,(3) if so, whether the work-product protection

was waived.[9]

### Legal Analysis

#### I.  Prematurity

The parties dispute whether the instant motion is premature under Judge Melançon's

March 13, 2008 order bifurcating class certification discovery and merits discovery (Rec. Doc.

137).  The ripeness of the instant motion was first placed at issue by defendants in their Motion for

Clarification wherein defendants requested that an order be entered holding the instant motion in

abeyance until after the court's decision on El Paso's motion for class certification.  Ths court

---

Request No. 3: The Davis Polk final report to the audit committee and the board of directors of Stone concerning
Davis Polk's investigation of Stone's reserve revisions and all notes, memos, reports and drafts of Davis Polk
interview(s) of Stone personnel and any other person in connection with Davis Polk's investigation and final report.

Request No. 4: All documents concerning any presentation by Davis Polk to Stone, its board of directors, or any
committee of the board of directors, including but not limited to, presentations by Davis Polk to the Audit Committee
on November 4, 2005 and November 28, 2005.

[9] In their opposition, defendants state that, since they have withdrawn the attorney-client privilege
designation on their amended privilege log served on March 21, 2008, there is no need for the court to reach the issue
of whether the Davis Polk materials are protected by the attorney client privilege.   Accordingly, El Paso's motion on
this basis is now moot.

denied the motion for clarification as moot, noting that the bifurcation order would be taken into account in reaching a decision on the motion to compel.

Defendants admit that Judge Melançon ordered at the scheduling conference that outstanding discovery be answered, but argue that they have satisfied his order by serving responses and objections and producing "nearly a million pages of documents." Defendants contend that the motion to compel is not ripe as the documents are not relevant to a determination of class certification.

I conclude that the instant motion is ripe for determination. At the scheduling hearing, Judge Melançon clearly ordered that outstanding discovery must be answered, whether or not it dealt with class certification issues. The transcript shows as follows:

> Stickney: Specifically to this case, there's a few reasons why we should do this contemporaneously.
>
> Number one, for the last number of months we have already been proceeding, commencing with discovery that is not a bifurcated system of discovery. We responded to discovery requests and interrogatories form the other side. It was not limited to class issues. We propounded discovery. We've reached agreement on certain documents that were going to be produced that wasn't limited to class discovery. We'll basically – if we're going to be imposing a new process now, we're going to be rolling back the clock, and inevitably –
>
> The Court: Let me stop you there and ask you this. Let's suppose that everything that's been propounded that hasn't been answered, if we go down this path of bifurcation, I say, *well that's in the universe now. Answer it timely. Get that done. So that's off the table. It's out there in the universe, so it doesn't stop that.*
>
> * * * *
> So I choose to exercise that broad discretion for bifurcation, but I also choose to instruct the lawyers to work– set out a joint plan of work, and the first one will be to the date that the – the amount of time that would be devoted to discovery of all types to the certification issue.
>
> Now, I'm going to backtrack a minute to what I said earlier. Any outstanding discovery as to anything but certification needs to be answered and

completed with whatever else is going on.  That's an order.  That's done.  It needs to be done.

Tr. 18, 19, 28, 29 (Emphasis added).

It is undisputed that El Paso propounded the discovery requests prior to the hearing before Judge Melançon.  Thus, it constituted "outstanding discovery" which, pursuant to Judge Melançon's directives, must be answered and completed.  Accordingly, the motion is ripe for determination.[10]

## II. The Work Product Doctrine

Defendants contend that the Davis Polk materials are opinion work-product and are entitled to near-absolute protection. Defendants argue that in order to obtain the materials, El Paso bears the burden to show either (1) Stone waived the work-product doctrine or (2) plaintiff's need for the documents is so compelling as to overcome the near-absolute protection.

The work product doctrine was first articulated by the Supreme Court in Hickman v. Taylor, 329 U.S. 495 (1947), and was codified in 1970 as Rule 26(b)(3) of the Federal Rules of Civil Procedure.  Chiasson v. Zapata Gulf Marine Corp., 988 F.2d 513, 514 (5th Cir. 1993).  Ordinarily, a party cannot discover documents or tangible things "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."  Fed. R. Civ. P. Rule 26(b)(3).

The work product doctrine protects two categories of materials: ordinary work-product and opinion work product.  Reedhycalog UK, Ltd. v. Baker Hughes Oilfield Operations Inc., No. 6:06

---

[10]  El Paso also argues that the discovery is relevant to the issue of class certification because some of the documents relate to loss causation.  In a 10b-5 action, plaintiffs must show at the class certification stage a causal connection between the material misrepresentation and the loss.  Oscar Private Equity Investments v. Allegiance Telecom, Inc., 487 F.3d 261, 264 (5th Cir. 2007).  Defendants correctly point out, however, that the loss causation doctrine considers whether and how a *public announcement* impacted on the trading price of a company's stock.  The discovery at issue involves *non-public* documents relating to the facts and circumstances leading up to the public announcement, and are therefore irrelevant to the causation inquiry.

CV 222, 2007 WL 1217897, *2 (E.D. Tex. Apr. 24, 2007). Disclosure of "ordinary work

product" is permitted if the party shows that it has substantial need for the materials to prepare its

case and cannot, without undue hardship, obtain their substantial equivalent by other means.

Fed.R.Civ.P. 26(b)(3)(ii). Opinion work product, as codified in Rule 26(b)(3), comprises "the

mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of

a party concerning the litigation." It is afforded a high degree of protection, and virtually no

showing will justify discovery of such material. *See* 8 CHARLES ALAN WRIGHT, ARTHUR R.

MILLER, RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE §2026 (2d ed. 2007).

The Fifth Circuit has indicated the standard for determining whether a document has been

prepared in anticipation of litigation:

> [i]t is admittedly difficult to reduce to a neat general formula the relationship
> between preparation of a document and possible litigation necessary to trigger the
> protection of the work product doctrine. We conclude that litigation need not
> necessarily be imminent, as some courts have suggested, as long as the primary
> motivating purpose behind the creation of the document was to aid in possible future
> litigation.

United States v. Davis, 636 F.2d 1028, 1039 (5th Cir. 1981) (citations omitted); *accord* In re

Kaiser Alum. & Chem. Co., 214 F.3d 586, 593 (5th Cir. 2000). Excluded from work product are

materials assembled in the ordinary course of business, or pursuant to public requirements unrelated

to litigation. U.S. v. El Paso Co., 682 F.2d 530, 542 (5th Cir. 1982). "The burden of establishing

that a document is work product is on the party who asserts the claim, but the burden of showing

that the materials that constitute work product should nonetheless be disclosed is on the party who

seeks their production." Hodges, Grant & Kaufmann v. U.S. Government, Dept. of the Treasury,

*I.R.S.*, 768 F.2d 719, 721 (5th Cir. 1985).

### A. Were the Davis Polk materials prepared in anticipation of litigation?

El Paso argues that the documents in question are not work product because they were not prepared in anticipation of litigation. El Paso contends that Stone's audit committee's primary motivation for initiating the investigation which generated the documents was to gain facts in order to recommend business decisions. El Paso points out that defendants have admitted that the investigation was performed pursuant to the audit committee's duties of policing a corporation's compliance with federally-mandated disclosure obligations. El Paso also argues that it is not enough that a federal agency's investigation is anticipated; the drafter must have intended that actual litigation would ensue.

"Factors that courts rely on to determine the primary motivation for the creation of a document include the retention of counsel and his involvement in the generation of the document and whether it was a routine practice to prepare that type of document or whether the document was instead prepared in response to a particular circumstance." Gator Marshbuggy Excavator L.L.C. v. M/V Rambler, 2004 WL 1822843, *3 (E.D. La. Aug. 12, 2004) (Mag. J. Wilkinson). The court continued that, "[i]f the document would have been created regardless of whether litigation was also expected to ensue, the document is deemed to be created in the ordinary course of business and not in anticipation of litigation." Id.; See also Piatkowski v. Abdon Callais Offshore, L.L.C., No. Civ.A.99-3759, 2000 WL 1145825, *2 (E.D. La. Aug. 11, 2000); 8 Charles Alan Wright, Arthur R. Miller, Richard L. Marcus, Federal Practice and Procedure § 2024 (2d ed. 2007).

Here the materials at issue were prepared by Stone's outside counsel, Davis Polk; thus, this factor weighs in favor of finding that the documents were prepared in anticipation of litigation.

Furthermore, I conclude that the documents were not created as part of a routine practice by Stone. Defendants submit the affidavit of Andrew L. Gates, General Counsel, Senior Vice

President, and Secretary of Stone, which states that because of Stone's October 6, 2005,

announcement of a write-down of its hydrocarbon reserve estimates, Stone anticipated that it could

be the subject of litigation and regulatory inquiries. According to Gates, the Audit Committee

authorized Davis Polk to commence an internal investigation into the factors that contributed to the

reserve revisions. It is clear that the materials were not created as part of a routine investigation in

the ordinary course of business.

Further, Stone's decision to initiate an internal investigation was made against a background

of lawsuits, class action or otherwise, resulting from similar public statements. *See e.g.*, In Re. LTV

Securities Litigation, 89 F.R.D. 595 (N.D. Tex. Dallas Div. 1981) (securities fraud suit alleging

corporation, its accountants, officers, directors and underwriters overvalued its inventories through

accounting manipulations); Greenberg v. Crossroads Systems, Inc., 364 F.3d 657 (5th Cir. 2004)

(plaintiffs alleged that company made material public misrepresentations that tended to inflate the

price of the company's stock; and, when the "truth" about these statements was revealed, the

company's stock declined sharply); Newby v. Enron Corp., 188 F. Supp.2d 684, 692 (S.D.

Tex.2002) (class action plaintiffs alleged defendants concealed adverse financial information

regarding Enron, leading to the artificial inflation of the price of Enron stock that declined

precipitously when the previously concealed information was disclosed).

El Paso relies on Guzzino v. Felterman, 174 F.R.D. 59 (W.D. La. 1997) (M.J. Tynes), but

the facts in Guzzino are quite different. In that case, Dean Witter commenced an internal

investigation after it learned that a branch office had overdrawn one of its bank accounts. The

investigation lead to the termination of an account executive for check kiting. Dean Witter learned

only after the employee was terminated that he was involved in a Ponzi scheme.[11] The court

concluded that the investigation was conducted in the ordinary course of business, and anticipated,

at worst, a federal regulatory investigation. The court noted that a different finding may have

resulted if Dean Witter had known of the Ponzi scheme when it commissioned the investigation, or

even learned about it during the investigation

As noted above, the facts in this case are quite different from those in Guzzino. Accordingly,

I find that the documents at issue were prepared in anticipation of litigation and are entitled to work-

product protection.

### B. Selective Waiver

Unlike the attorney-client privilege, the burden of proving waiver of work-product immunity

falls on the party asserting waiver. S.E.C. v. Brady, 238 F.R.D. 429, 444 (N. D. Tex. 2006). The

parties agree that work-product protection is waived if the materials are either disclosed to

adversaries *or* treated in a manner that substantially increases the likelihood that an adversary will

come into possession of the matter. *See* High Tech Communications, Inc. v. Panasonic Co., 1995

WL 83614, 5 (E. D. La.1995); Brady, 238 F.R.D. at 444 (emphasis added).

Movers contend that defendants waived their work-product protection when they gave to the

SEC copies of documents generated by the Davis Polk investigation. Defendants counter that they

did not waive their protection because the SEC was a non-adverse party with whom they shared a

common interest, and because they provided the documents under a confidentiality agreement.

Defendants argue that their disclosure to the SEC was only a limited, or "selective waiver" which

---

[11] Ponzi schemes are a type of illegal pyramid scheme named for Charles Ponzi, who duped thousands of New England residents into investing in a postage stamp speculation scheme back in the 1920s. http://www.sec.gov/answers/ponzi.htm

did not waive work product immunity vis-a-vis movers.  This issue has not been addressed by the

Fifth Circuit.

The doctrine of "selective waiver" was created by the Eighth Circuit in the context of the

attorney client privilege:

> We finally address the issue of whether Diversified waived its attorney-client privilege with respect to the privileged material by voluntarily surrendering it to the SEC pursuant to an agency subpoena. As Diversified disclosed these documents in a separate and nonpublic SEC investigation, we conclude that only a limited waiver of the privilege occurred. . . . *To hold otherwise may have the effect of thwarting the developing procedure of corporations to employ independent outside counsel to investigate and advise them in order to protect stockholders, potential stockholders and customers*.

Diversified Industries, Inc. v. Meredith, 572 F.2d 596, 611 (8th Cir. 1977) (citations omitted)

(emphasis added).[12]

Since Diversified, "many courts have grappled with litigants' attempts to disclose work

product and attorney-client communications without having such disclosures constitute a broad

waiver of the privileges." In re Initial Public Offering Securities Litigation, — F.R.D. —, 2008 WL

400933, 4 (S.D.N.Y. 2008).  At least five Circuits have affirmatively rejected the doctrine of

selective waiver in the context of non-opinion work product immunity:

> As a review of federal circuit case law has indicated, there is but one circuit that has applied the selective waiver doctrine to attorney-client material. All other circuits addressing the matter have refused to apply the doctrine. In the context of non-opinion work product, no circuit has adopted selective waiver and five circuits have rejected the doctrine. Some circuits have expressly not precluded the

---

[12] The Eighth Circuit subsequently rejected selective waiver in the context of non-opinion work-product. *In re Chrysler Motors Corp. Overnight Evaluation Program Litigation* , 860 F.2d 844, 845 (8th Cir. 1988).  *See also In Re Qwest Communications Intern. Inc.*, 450 F.3d 1179, 1189 (10th Cir. 2006), *In re Initial Public Offering Securities Litigation,* ____ F.R.D. ____ , 2008 WL 400933, 3 (S.D.N.Y Feb. 14, 2008) *(*"the Eighth Circuit has apparently declined to extend selective waiver to work product, at least in the context of a selective disclosure to a non-government adversary. Without discussion of Diversified Industries, the Eighth Circuit found that work product protection was waived where a party made certain material available to adversaries under a confidentiality agreement" in In Re Chrysler Motors).

application of selective waiver but have limited that possibility to cases where the initial disclosure was not to an adversary or was accomplished under a confidentiality agreement strictly limiting further dissemination by the government.[13]

In re Qwest Communications Intern. Inc., 450 F.3d 1179, 1196 (10th Cir. 2006). The single circuit to adopt selective waiver did so only as to opinion work-product. *See* In re Martin Marietta Corp., 856 F.2d 619, 625 (4th Cir. 1988).

Considering the foregoing authorities, it is clear that the doctrine of selective waiver has been roundly rejected by most courts which have considered it in the context of the qualified work product immunity.

**1. Was the SEC an Adversary?**.

Defendants contend that Stone shared a common interest with the SEC in determining the facts and circumstances surrounding Stone's revisions to its hydrocarbon reserve estimates such that there was not an adversarial relationship between Stone and the SEC.

Defendants rely on In re LTV Securities Litigation, 89 F.R.D. 595, 616 (N.D. Tex.1981), In In Re LTV, four years following Diversified, then-District Judge Higginbotham considered the issue of waiver of work-product immunity. There, plaintiffs in a civil action sought to discover the investigative report which an LTV lawyer had submitted to the SEC regarding the company's compliance with its financial disclosure obligations, pursuant to a consent decree. Noting that the lawyer – titled "Special Officer" – was functioning in a hybrid of two roles, that of government investigator and privately retained counsel, the court ultimately concluded that the documents at issue were protected.[14]

---

[13] *See* In re Steinhardt Partners, L.P., 9 F.3d 230, 236 (2nd Cir. 1993); In re Sealed Case 676 F.2d 793, 820, 824 (D.C. Cir. 1982); In re Subpoenas Duces Tecum , 738 F.2d 1367, 371-72; 1375 (D. C. 1984).

[14] This conclusion was reached by analyzing the attorney-client privilege and work-product rules from the standpoint of the two "clients" of lawyers, with the understanding that the "sphere of confidentiality" enjoyed by the

The court distinguished the case before it, where the Special Officer was retained by the defendant company pursuant to an SEC consent decree, from the typical situation where counsel is hired in anticipation of civil or criminal liability. Id. at 614-615. At the Commissioner's discretion, the Special Officer was required to submit to the SEC any documents, statements or other information *prior to submitting them to LTV*. Id. at 615. Further, the SEC had the right to confer with the Special Officer, and while the SEC might be requested to keep the documents confidential under the Final Judgment, the discretion to request such treatment rested with the Special Officer and not LTV. Id.

Defendants point out that, like the Special Officer in LTV, Stone's Audit Committee was aligned with the SEC because it was functioning in an oversight capacity. Defendants focus on Judge Higginbotham's findings that LTV voluntarily chose to enter into the consent decree and retain the Special Officer, rather than risking an SEC investigation; and that, where the attorney-client and work-product privileges were concerned, the investigation was a joint enterprise between LTV and the SEC. Id. at 619-621. Defendants buttress their argument that, following the enactment of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, Sec. 301 116 Stat. 745, 776, audit committees are required to police the corporation's compliance with federally mandated disclosure obligations.[15] Defendants also rely on the SEC's letter to Stone advising that its inquiry

---

Special Agent was a "synthesis" of the privileges available to his clients, were he serving in the role of government investigator or private investigatory counsel. 89 F.R.D. at 615.

[15] The Sarbanes-Oxley Act was enacted to protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to the securities laws, and for other purposes.

was not to be construed as an indication that the SEC thought a violation had occurred to support a

finding that Stone's Audit Committee and the SEC's interests were aligned.

I find, however, under the facts of this case, that Stone's relationship with the SEC was

adversarial. In LTV, the court considered the SEC and LTV to be joint participants in a joint

enterprise. The court noted that the disclosure, as a matter of course, was an essential element of the

consent decree, because the access was necessary to determine the exact nature of the LTV

violations and whether the proper corrective measures were being undertaken. 89 F.R.D. at 620-

621. In analyzing the nature of the privileges that the Special Officer was "equipped with," the

court reflected that the attorney-client privilege and the work-product rule ought not to be applied

inflexibly and "[c]hanging circumstances require courts constantly to review the need for and extent

of existing privileges." Id. at 621. The court reasoned that the outer limits of the privileges are still

amorphous, the privileges could not be reduced to simple doctrinal statements as recognized by Rule

501 of the Federal Rules of Evidence which directs the federal courts to apply the principles of the

common law as they may be interpreted in light of reason and experience. Judge Higginbotham

concluded that the class had not shown a need for discovery that would justify the adverse impact of

a rejection of the special officer's privilege would have on the investigation and the Commission's

ability to negotiate similar consent decrees. Id.

In the instant case, however, no special investigatory officer was appointed and there was no

consent decree that required disclosure. Here, the materials were provided in response to the

Commissioner's staff's request. See Exh. F. to Preston Declaration. The documents were not

provided to assist the SEC in routine regulatory matters but, instead, were provided, as defendants

themselves emphasize, in connection with the unique write-down of hydrocarbon reserves. Even

though the SEC inquiry did not result in any formal proceedings against Stone, the presence of their

adversarial relationship does not depend on the existence of litigation. See Id. I therefore find that

Stone and the SEC's relationship was adversarial.

**2. Was Stone's confidentialty letter agreement effective to prevent disclosure to adversaries?**

Defendants argue that Stone's confidentiality letter agreement with the SEC protected the

disclosure of the documents from adversaries. The letter agreement regarding confidentiality

provided that Stone did not intend to "waive the protection of any potentially applicable privileges

as respects third parties." Id. The agreement, however, also recognized that:

> The Staff will maintain the confidentiality of the Davis Polk Materials pursuant to
> this agreement and will not disclose them to any third party, *except to the extent that
> the Staff determines that disclosure is otherwise required by law or would be in
> furtherance of the Commission's discharge of its duties and responsibilities.*

Id. (emphasis added). Based on this agreement which gives the SEC a broad discretion to disclose

the documents "in furtherance of the Commissioner's discharge of its duties and responsibilities"

gave little expectation of privacy to Stone and is not altered by the fact that the SEC ultimately did

not disseminate the materials to any other third parties. I therefore find that the confidentiality

agreement was insufficient to preclude the documents' disclosure from adversarial parties.

Having concluded that Stone's relationship with the SEC was adversarial, the

confidentiality letter agreement between Stone and the SEC was insufficient to protect the disclosure

of the documents from other adversaries, I conclude that defendants waived their work-product

protection.

**3. Do the documents constitute opinion work product?**

Defendants characterize the materials as opinion work-product because they include

memoranda of witness interviews and outlines of presentations to Stone's Audit Committee and

Board of Directors, and thus concern either mental impressions, conclusions, opinions, or legal

theories of Davis Polk.  Defendants maintain that movers must show *either* that their work-product

privilege has been waived or, alternatively, a compelling reason to necessitate the production of their

opinion work-product.

As discussed above, no Circuit as chosen to apply the doctrine of selective waiver to the

work product doctrine, as opposed to the attorney-client privilege.  Only one court has applied

selective waiver to opinion work-product.  <u>Martin Marietta Corp.</u>, 856 F.2d at (4th Cir. 1988).  In

the absence of any persuasive authority in this Circuit, I conclude that selective waiver does not

apply to protect disclosure of the documents at issue, whether they constitute opinion or non-opinion

work product.

### *Conclusion*

For the foregoing reasons, the undersigned concludes that Stone waived its qualified work-

product protection under the facts presented.[16]  Accordingly,

**IT IS HEREBY ORDERED** that El Paso's motion to compel production of purportedly

privileged documents is **GRANTED**.

**IT IS FURTHER ORDERED** that defendants shall produce all Davis Polk materials at

issue **within twenty days of this order**.

Signed at Lafayette, Louisiana, on August 14, 2008.

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)

---

[16] It is therefore unnecessary to address the effect of Stone's additional production of the documents to Ernst & Young LLP, in connection with its services as Stone's auditor, and counsel for Plains Exploration and Production Co. and Energy Partners Ltd., in connection with the potential merger with those companies.